Argued and submitted November 6, 1997, affirmed February 4, 1998

## Melissa K. ESTES,
*Appellant,*

*v.*

## LEWIS AND CLARK COLLEGE,
*Respondent.*

## (9509-06480; CA A94941)

954 P2d 792

Richard C. Busse argued the cause for appellant. With him on the briefs were Scott N. Hunt and Busse & Hunt.

I. Franklin Hunsaker argued the cause for respondent. With him on the brief were David A. Ernst, Clay D. Creps and Bullivant, Houser, Bailey, Pendergrass & Hoffman.

Before De Muniz, Presiding Judge, and Haselton and Linder, Judges.

LINDER, J.

## LINDER, J.

In this wrongful discharge action, plaintiff appeals the trial court's grant of summary judgment for defendant. The trial court concluded that, on the record before it, an objectively reasonable juror could not find that plaintiff's position was eliminated in retaliation for engaging in allegedly protected activities, rather than because of legitimate budget concerns. We review the record in the light most favorable to plaintiff, as the nonmoving party, by giving her the benefit of all conflicts in the evidence and all reasonable inferences that may be drawn from the record as a whole. We then determine whether the record entitles defendant to judgment as a matter of law. ORCP 47C; *Jones v. General Motors Corp.*, 325 Or 404, 414, 939 P2d 608 (1997). We affirm.

Because plaintiff's claim depends significantly on inferences, rather than direct evidence, we discuss the facts in some detail. Plaintiff was the reference librarian director of Attorney Services, which was a program administered through the library of the Northwestern School of Law of Lewis and Clark College. Peter Nycum, the associate dean of library and computer services and an ethics professor at the law school, created Attorney Services in 1981. At that time, the use of computers for legal research was relatively novel. The idea behind the program was to provide law alumni (and eventually the local bar) with computerized research services, especially Lexis and Westlaw, because many lawyers were then not adept with computers and had little or no access to such services. Plaintiff, who had worked in the law library and in Attorney Services while attending law school, was hired to fill the director's position in September 1992, shortly after her graduation. She was employed as an at-will employee, with her salary subject to renegotiation annually.

In 1994, Nycum and plaintiff clashed over certain workplace issues and, as a result, their working relationship deteriorated. Plaintiff's and defendant's evidence of what brought Nycum and plaintiff into conflict is in dispute; we therefore accept plaintiff's account.[1]

---

[1] Nycum agreed that his relationship with plaintiff deteriorated, but he attributed it to a workplace incident other than either of the two that formed the basis for plaintiff's suit.

The first of plaintiff's and Nycum's workplace disagreements arose in April 1994. With plaintiff's consent, Nycum set up a concealed video camera in plaintiff's office in an effort to detect whether a law school graduate was entering after hours and taking client lists. Both plaintiff's understanding and Nycum's intent were that the video camera would be on only after hours, that is, weekends and after regular work hours on weekdays. Plaintiff discovered, however, that the video camera had to be turned on and off manually, that the actual hours of taping varied considerably, and that taping occasionally occurred during regular work hours. She was upset about that fact and raised her concern with Nycum, who was not overly troubled and did not remove the video camera. Plaintiff then researched the law on the subject, concluded that the taping possibly was illegal or tortious,[2] and advised Nycum of her research and her conclusion. She insisted that it stop and that Nycum inform employees who had been videotaped. Nycum reacted by becoming "very angry" at her opposition to the videotaping. Specifically, he raised his voice and was "forceful and aggressive" with her. Nycum removed the video camera either immediately or soon after the confrontation. There were no further hostile exchanges between Nycum and plaintiff over the videotaping. For the most part, plaintiff's and Nycum's working relationship remained civil and congenial, despite the conflict over the videotaping.[3]

That changed four months later, however. During the first week of August, plaintiff learned that, contrary to library policy, a law firm had been permitted to check out a textbook manuscript written by Lewis and Clark law professor Craig Johnston. The circumstances suggested that staff at the firm may have copied portions of the manuscript, but

---

[2] Plaintiff could not remember more specifically the nature of the possible illegality revealed by her research. Nycum, however, recalled that plaintiff told him the videotaping should be stopped because federal law required notice of it.

[3] Plaintiff stated in her deposition that "after that," Nycum's conduct towards her became "hostile, progressively so over time." The context makes it unclear whether "after that" meant after the videotaping incident or whether plaintiff was referring to the deterioration in their interactions that followed a second disagreement four months later. Elsewhere in her deposition, however, plaintiff unequivocally stated that before the second disagreement with Nycum, her interactions with him remained civil and mostly congenial.

when the firm was informed that the document was copyrighted, it denied any copying and returned only the manuscript. Plaintiff informed Nycum, who told plaintiff not to tell Johnston or anyone else about it because he did not want anyone to know that the law library had let the book out of its possession. After that conversation, plaintiff learned that the firm that had checked out the manuscript was litigating a matter in which Johnston was to appear the next day as an expert witness for the opposing side. Plaintiff could not reach Nycum to give him that additional information, so she contacted the Oregon State Bar for guidance on her responsibilities, if any. Bar counsel could not confirm whether either an ethics violation or a possible tort (conversion of property) might be involved, but advised plaintiff to tell Johnston about the firm's access to the manuscript. Plaintiff spoke with Johnston that same day. The next day, she telephoned Nycum, told him about the litigation, about seeking the bar's advice, and about informing Johnston of what had happened. Nycum became very angry and "screamed" at plaintiff through most of the phone conversation.

After the August manuscript incident, plaintiff's and Nycum's working relationship progressively deteriorated. Nycum was consistently hostile towards plaintiff and treated her generally with "disdain and condescension." At weekly staff meetings, Nycum contradicted plaintiff's statements and countermanded some of her orders regarding law students. He refused to make eye contact with plaintiff or to acknowledge her presence at law school functions or passing her in hallways. He was "brusque and abrupt."

Plaintiff tried to talk to Nycum about his hostile attitude, but he remained brusque and unresponsive. Nycum thereafter "staged an altercation" between plaintiff and another library employee, the nature of which is unclear on this record, but it involved Nycum falsely telling another employee in plaintiff's presence that plaintiff had accused the employee of lying. After that incident, plaintiff went to James Huffman, the dean of the law school, to talk to him about Nycum's behavior, which plaintiff believed related directly to the manuscript incident. Dean Huffman did not seem to know about the manuscript problem, but he commented that

Nycum could be vindictive and offered to speak to him. Plaintiff deferred to Huffman's judgment as to whether to take that step and told him that her primary concern was that Nycum might "retaliate against me by eliminating my position." Huffman in fact talked to Nycum about the manuscript incident. Nycum's description of the circumstances surrounding the manuscript's removal and return was similar to plaintiff's; Nycum and plaintiff had the same concerns about whether something inappropriate had been done in the course of the litigation and whether library resources had been abused. As far as Huffman could tell, Nycum was not agitated by the incident. Nor did Nycum say anything to Huffman about plaintiff's handling of the matter.

In the fall of 1994, shortly after the manuscript incident, the law school began its annual budget preparations. First quarter figures indicated that fiscal year 1994-95 was going to be an unusually lean budget period for the college as a whole. By October, Lee Gadinas, the associate dean for administrative affairs and director of business services, had reviewed the library budget for prior fiscal years and noticed some areas of concern. On October 10, he wrote Nycum a memo outlining those concerns, the first of which related to the Attorney Services program. Gadinas observed that income for the program was $10,000 under projections for fiscal year 1993-94 and showed a "downward trend" from prior years. Moreover, income for the first quarter of the new fiscal year already was below the year before. Because the program had been budgeted on an assumption that income would increase and not just remain stable, the projected deficit created what Gadinas described in his deposition testimony as a "double whammy." Gadinas concluded his memo by asking Nycum to note that the entire law school budget was "running close to break even," which required all programs to adhere to their budgets. Gadinas urged that Nycum and he talk about that and other budgetary matters.

Because of Nycum's considerable pride in and strong support for the program, Gadinas knew the budgetary problems would create an issue for Nycum. Nycum had always been a strong advocate for the Attorney Services program. He had created Attorney Services and considered it "his baby." For that reason, Gadinas approached Nycum by putting his

concerns in a memo, rather than raising them with Nycum in person.

After Gadinas's memo, Gadinas and Nycum independently reviewed the budgetary data for the program. In a memo to Gadinas dated October 14, 1994, Nycum acknowledged that Attorney Services "has been on a straight line decline for two plus years." He attached a two-page summary of budget statistics covering the major components of the Attorney Services operations. The statistics caused Nycum to question whether Attorney Services should continue as it was then constituted. He said that he would withhold his opinions, even though he had strong views, until Gadinas could make his own evaluation of the data. He concluded by stating:

> "I, however, can reach several conclusions. First, there certainly is enough data upon which to reach a meaningful course of action. Second, and although I am angry that [plaintiff] has not been on top of these statistics and the trends they represent * * * I should also have been more observant.
>
> "I will be anxious for your views on what the data says and what you believe our course of action should be."

Three days later, on October 17, Gadinas and Nycum met with plaintiff. Gadinas wanted the meeting for "fact-gathering" rather than "game-planning." Neither Nycum nor Gadinas suggested to plaintiff that either the program or her position might be in jeopardy. Their purpose was to discuss Attorney Services and obtain plaintiff's views as to why revenue was down. Plaintiff told Nycum and Gadinas that, in her opinion, the greatest effect on the program was the fact that many law graduates could not get positions in law firms and, on contractual bases, were performing many of the same research services that Attorney Services could provide. The three spent most of the meeting discussing the weakening demand and changing market for the Attorney Services program.

After the meeting, Gadinas summarized his thoughts in a second memo prepared that same day, October 17. In the memo, Gadinas went over the gross income figures

for the program, showing that it had peaked at $82,000 in fiscal year 1993, dropped to $71,000 in fiscal year 1994, and was projected to drop to $62,000 in fiscal year 1995. As income was dropping through those years, expenses were increasing. Even if projected gross income did not fall as low as predicted, the program would likely hit its lowest point in five years. Gadinas thought the projection was buttressed by the fact that manual research, which consistently was the source of at least 50 percent of the program's gross income, was clearly on a downswing. Net income, without accounting for the salaries of plaintiff and the other full-time employee as program expenses, was likely to be only $12,000. Gadinas pointed out that the job forecast for graduates remained bleak and "contract work by graduates will be more competition as time goes on." Based on what Nycum and plaintiff had told him about the services that contract attorneys can provide, Gadinas thought the program simply "cannot compete." In addition, the program's biggest firm customers were the source of less and less business and, as Nycum and plaintiff had admitted to Gadinas, marketing efforts had not been successful. The "one big year" for the program 1993 when it had its greatest income appeared to be caused by a temporary need for services created by firms that had downsized. Since then, the market had adjusted and contract attorneys were filling those needs. Gadinas set out his recommendation:

> "I believe Attorney Services is no longer needed in the current configuration. You and I discussed three years ago disbanding the current configuration and rolling Attorney Services into [t]he Reference [D]epartment. You chose not to, and when income went up, the idea was put on hold. However, the times have changed even more since then. More and more graduates are sophisticated in the art of computerized research. More and more firms have LEXIS and Westlaw access. Attorney Services is less needed. * * *
>
> "* * * * *
>
> "Obviously this means personnel changes (layoffs) in terms of [plaintiff and the other full-time employee]. If a change is done, I recommend that a nice severance package be given."

Gadinas concluded the memo by asking Nycum for his opinion. He was not, however, leaving the decision to Nycum. Gadinas has a consensus decision-making style and

hoped Nycum would concur in his recommendation to Huffman, who would make the final decision. If Nycum had not concurred, Gadinas would have presented the information and recommendation to Huffman alone. Ultimately, Nycum concurred in Gadinas's recommendation and, in late October, they met jointly with Huffman to present it to him.

The problems with Attorney Services were not news to Huffman. Continuing the program had been an issue nearly every budget cycle. The program was supposed to generate a profit, and in some years, depending on how the accounting was done, it actually did so. But the information presented by Gadinas and Nycum showed that over the last two or three years, there had been a gradual and steady decline in revenue. If current trends continued through the year, the program might generate a deficit of as much as $50,000. Huffman reviewed the information and asked Nycum why revenues were declining. Nycum explained the events that had led to a reduced demand for the program's research services, including the prevalence of contract attorneys in the market. Huffman was persuaded that the program could be expected only to "continue to be a losing proposition." He accepted Nycum's and Gadinas's recommendation.

On November 7, plaintiff provided Gadinas with a memo outlining ideas to market Attorney Services more effectively, all of which involved making the local bar more aware of the services the program provides. She acknowledged that the biggest effect on program revenues was the "tremendous" increase in contract attorneys practicing locally in the last two to three years. She offered no solution for that problem.

Gadinas and Nycum met again with plaintiff on November 11. The stated purpose for the November 11 meeting, according to plaintiff, was to follow up on her marketing ideas. Plaintiff could not remember who asked for the meeting. Rather than follow up on her ideas, however, Gadinas and Nycum informed plaintiff that Attorney Services was being downsized, that her position and that of the other full-time salaried employee were being eliminated effective December 31, 1994, and that she would be paid through the

end of January 1995. After her separation from the college, plaintiff brought this wrongful discharge action, claiming that her position was eliminated in retaliation for her opposition to what she in good faith believed was unlawful videotaping, for her efforts to remedy the possibly tortious conversion of the manuscript, and for her consulting with the Oregon State Bar over the manuscript incident.

■    We turn to relevant legal standards. Generally, an at-will employee may be discharged at any time for any reason by an employer. *Patton v. J. C. Penney Co.*, 301 Or 117, 120, 719 P2d 854 (1986); *Rauda v. Oregon Roses, Inc.*, 147 Or App 106, 108-09, 935 P2d 469, *rev allowed* 326 Or 233 (1997). The tort of wrongful discharge is an exception to that rule, one based on public policy. It provides a remedy when an employee is discharged for fulfilling an important societal obligation or for exercising an employment-related right of public importance. *Holien v. Sears, Roebuck and Co.*, 298 Or 76, 83-86, 689 P2d 1292 (1984). To succeed, then, the employee must establish a "causal connection" between a protected activity and the discharge. *See generally Shockey v. City of Portland*, 313 Or 414, 422, 837 P2d 505 (1992), *cert den* 507 US 1017 (1993). That is, the employee's protected activity must have been a "substantial factor" in the motivation to discharge the employee. *Holien*, 298 Or at 90 n 5. As we have said in the analogous context of discrimination actions, to be a substantial factor, the employer's wrongful purpose must have been "a factor that made a difference" in the discharge decision. *Nelson v. Emerald People's Utility Dist.*, 116 Or App 366, 373, 840 P2d 1384 (1992), *aff'd in part, rev'd in part* 318 Or 99, 862 P2d 1293 (1993).

■    The question here is whether the record, viewed most favorably to plaintiff, would permit an objectively reasonable juror to find the necessary causal link between plaintiff's discharge and her protected activity.[4] Plaintiff

---

[4] Defendant disputes whether plaintiff's opposition to the videotaping involves a public duty of importance. Conversely, defendant concedes that a lawyer's effort to ensure compliance with the ethical code by seeking bar guidance is likely protected activity. We need not decide which, if any, of plaintiff's allegedly protected activities would support a wrongful discharge claim given our conclusion that the record does not establish sufficiently the causal connection between her activities and her discharge.

argues that the record permits that inference, based on Nycum's hostility and the deterioration in his working relationship with plaintiff, coupled with his "sudden and unexplained abandonment" of his strong support for the program. From this, plaintiff asserts, the record at least gives rise to a jury question as to whether defendant's motivation for the discharge was retaliatory and the budget concerns were pretextual.

A threshold problem for plaintiff is that the record establishes, without dispute, that Nycum did not unilaterally downsize the program and eliminate plaintiff's and another staff person's positions. He concurred in Gadinas's recommendation to do so, but Gadinas, not Nycum, initiated the recommendation,[5] and Huffman, not Nycum, was the ultimate decisionmaker. Because of that, plaintiff could survive the motion for summary judgment only if there is evidence from which a jury could find either: (1) that Gadinas's and Huffman's budget concerns were pretextual and that they, as well as Nycum, were motivated to discharge plaintiff because of her protected activities; or (2) that Nycum, even if he was the only wrongfully motivated administrator, was so influential in the decision to downsize the program as to be a "substantial factor" in the discharge. Plaintiff relies on both theories of liability.

As to the first theory, the record simply does not support an inference that either Gadinas or Huffman was motivated to retaliate against plaintiff because of her protected activities. A reasonable juror could not conclude that Gadinas was even aware of plaintiff's protected activities and Nycum's anger over them, let alone that Gadinas would have been motivated to retaliate against plaintiff because of them.[6] Unlike Gadinas, Huffman was aware that plaintiff believed Nycum was hostile towards her following the unauthorized release of the manuscript, because plaintiff told him

---

[5] Plaintiff argues that certain circumstances (*i.e.*, the "change" in the purpose of the November 7 meeting with plaintiff) support an inference that Nycum was the person who initiated the budget concerns and was the moving force behind Gadinas's recommendation. We find no support for that conclusion in this record.

[6] Gadinas stated unequivocally in his deposition that he was completely unaware of the videotaping and the manuscript incidents and of Nycum's anger over them.

as much. But there is no basis to infer that Huffman shared that hostile reaction, acquiesced in it, or was himself motivated by hostility over the incident. To the contrary, plaintiff's own evidence was that Huffman, without plaintiff's prompting, offered to intervene on her behalf. Also without plaintiff's prompting, Huffman followed through on that offer by asking Nycum about the manuscript incident. Nothing in Nycum's comments to Huffman suggested that Nycum was upset with plaintiff's handling of the matter or that he was otherwise agitated about the incident. Even assuming for the moment that one could reasonably conclude that Nycum was "wrongfully motivated," the record does not permit the inference that either Gadinas or Huffman was "tainted" by Nycum's hostility towards plaintiff or, more to the point, that they shared his wrongful motive.

■    Plaintiff nevertheless argues that the record creates a question of fact as to whether Gadinas's and Huffman's budgetary justifications for downsizing the program were pretextual. Plaintiff relies on her own opinion disputing the accuracy of their conclusions about the program's fiscal health. As already discussed, however, the record does not support an inference that either Gadinas or Huffman was motivated to discharge plaintiff because of her protected activities. Thus, even if they were shown to have analyzed the budget statistics incorrectly, that would establish only that they were wrong, not that they were acting pretextually and for some illicit motive.

Moreover, the record does not sufficiently support a conclusion that the budget projections were flawed. To give rise to a jury question, the record needs to disclose a *genuine* issue of fact on the point:

> " 'In deciding whether a genuine issue of fact exists, courts generally read "genuine issue" to mean "triable issue." Before a party has a triable issue, he or she must have sufficient evidence to be entitled to a jury determination. This has led both courts and commentators to compare the motion for summary judgment to the motion for a directed verdict.' " *Jones*, 325 Or at 413 (quoting with approval 10 Wright & Miller, *Federal Practice and Procedure* § 2713).

The standard for deciding what is "sufficient evidence to be entitled to a jury determination" may not be susceptible of ready quantification. We have no doubt, however, that plaintiff's claim of pretext, insofar as it was based on error in the budget analysis, does not meet that standard. Plaintiff disputed the accuracy of the budget forecast only on the basis of her own opinion that Gadinas and Nycum each had "incorrectly analyzed the data." By her own admission, though, plaintiff was not responsible for the budget and had no background or experience analyzing budget performance, projections, and statistics. Moreover, her opinion is unsubstantiated. Plaintiff did not offer budget forecasts of her own; she did not present countering data; and she did not provide specific criticism of the budget statistics on which Gadinas and Nycum relied. Plaintiff simply stated at one point that Gadinas and Nycum had not taken into account two "unusual expenditures," without explaining what difference it would have made if they had done so. She also claimed that they changed their accounting methodology, but the record does not reflect a change. Plaintiff offered her opinion that revenue was about the same as in prior years, but she did not explain how or why she arrived at that conclusion. In short, a reasonable juror could not discredit the legitimacy or accuracy of the budget projections on the basis of plaintiff's undocumented and unsubstantiated opinion that the budget figures were flawed.

On this record, then, an objective juror could not reasonably conclude that Gadinas and Huffman were motivated by anything other than the budget problems. The focus thus narrows to plaintiff's second theory that, even accepting the legitimacy of Gadinas's and Huffman's budget concerns, there is at least a question of fact as to whether Nycum was wrongfully motivated and, if so, whether his weakened support for the program could be found to have been a "substantial factor" in plaintiff's discharge.

With regard to Nycum, plaintiff's argument is that a reasonable juror could find that he became very angry with plaintiff after the manuscript incident. On the basis of that,

plaintiff asserts, a juror could infer that Nycum was motivated to retaliate against plaintiff by downsizing the program and eliminating her position. Whether Nycum's hostility alone can support that inference, however, is highly questionable in light of *Shockey*, 313 Or at 422-23. The dispute in *Shockey* was whether the plaintiff was discharged for his noncompliance with a work safety policy (no beards) or for his protest against that policy (a protected activity). The plaintiff presented evidence that permitted a conclusion that managers were hostile towards the plaintiff because of his protest against the policy. In addition, there was evidence that management had engaged in retaliatory firings of other employees who spoke out against management practices or on safety issues; that at least one manager admitted being angry at the plaintiff for his protest; and that another manager admitted to not helping the plaintiff find other work before firing him, even though he had assisted others who had been fired for not shaving their beards. The Oregon Supreme Court held that, while the "plaintiff had no proof to spare," the evidence as a whole was sufficient to allow a trier of fact to conclude that the plaintiff was discharged for his protest, not his noncompliance. *Id.* at 423.

Here, viewing the record in the light most favorable to plaintiff, Nycum became exceedingly unpleasant and hostile in his day-to-day interactions with plaintiff. Apart from the allegedly retaliatory action at issue in this case, however, there is no suggestion that Nycum had at any other time altered the conditions of plaintiff's employment (*i.e.*, poor performance evaluations, salary reduction, reduced workplace privileges or benefits). Nor is there evidence that he had ever retaliated against other employees who disagreed with him at other times. Plaintiff relies on Nycum's disagreeable temperament, nothing more. Under *Shockey*, that would not appear to be enough. Moreover, this case involves not just plaintiff's discharge, but a significant reduction of a program that Nycum had considered "his baby," together with the elimination of another full-time staff member's position. In essence, plaintiff claims that to retaliate against her alone, Nycum "threw his baby out with the bath water" and discharged an innocent employee as well. The nature of the

retaliation adds an element of implausibility that would seem to require at least some added evidence to create the inference that Nycum was motivated to downsize the program by plaintiff's protected activities, rather than by legitimate budget concerns.

Even assuming, however, that a reasonable juror could find that Nycum was wrongfully motivated, Nycum's recommendation still must have been a "factor that made a difference" in the decision to downsize the program. Plaintiff argues that the record creates a question of fact on that point, based on evidence that Nycum had consistently defended the program in past years and that the program had not then been cut or reduced, despite budget difficulties. From those facts, plaintiff urges, a jury could infer that, but for Nycum's failure to defend the program, Gadinas would not have made the recommendation to downsize Attorney Services or Huffman would not have accepted that recommendation.

Although we review the evidence in the light most favorable to plaintiff, we are not at liberty to disregard evidence that hurts plaintiff's position, if that evidence is undisputed. Here, the inference that plaintiff seeks to draw is significantly undermined by several facts, none of which was contradicted. To be sure, until 1994, Nycum consistently had defended the program over the years, even in the face of criticism and controversy over whether the program was sufficiently income-producing. But the record also establishes that, notwithstanding Nycum's history of steadfastly defending the program, it had been under close scrutiny only three years before and, but for its sudden budget improvement, might have been scaled back then. The one year of markedly increased income proved to be an anomaly. Income for Attorney Services went on a "straight line decline" and, when the decision to scale back was revisited in late 1994, income was projected to fall to its lowest point in five years. The program was forecast to end the fiscal year with as much as a $50,000 deficit.[7] Those projections came at a time when the college's

---

[7] Plaintiff made some effort to impeach the accuracy of the budget forecasts, but as we have already explained, the basis on which she did so was not sufficient to create a genuine issue of fact on that point.

overall budget picture was unusually lean and pressure was placed on all programs to meet budget expectations.

There is no dispute as to the source of the weakened demand for Attorney Services. Computerized legal research, and the skills to provide it, no longer were a novelty. That fact, coupled with the large number of unemployed law school graduates who could provide research on a contractual basis, had significantly reduced demand for Attorney Services in the local bar. Plaintiff's own evidence, as well as defendant's, pointed to those factors as keys in the declining market for the program's services. No one, including plaintiff, suggested that those factors would change.

Finally, Gadinas, not Nycum, initiated the budget review and first raised the concerns about the program's fiscal health. Thus, the problems with the budget were destined to surface; Nycum played no part in that. The evidence is undisputed that if Nycum had not joined in the recommendation, Gadinas would have taken the recommendation and support for it to Huffman without Nycum. The record is devoid of anything to suggest that Huffman, without Nycum's concurrence, would have rejected Gadinas's recommendation. Huffman accepted the recommendation to downsize the program because he was persuaded by the budget figures and by the fact that the program would remain a losing proposition into the future. The record provides no basis to conclude that without Nycum's concurrence, Huffman would have made any other decision.[8] Without that inference, Nycum's role could not reasonably be found to have been "a factor that made a difference" in the ultimate decision to downsize Attorney Services and to eliminate the salaried staff positions, including plaintiff's.

---

[8] Nycum traditionally had defended the program based on the service it provided to the legal community, the income and education it provided to students, and the fact that it was a source of good public relations for the law school. Those justifications had nearly failed to spare the program three years before, at a time when Nycum's support for the program appears to have been unequivocal. On this record, it cannot reasonably be inferred that Nycum's traditional arguments in the program's defense, had he advanced them as counters to Gadinas's recommendation and the projections it was based on, would have altered Huffman's ultimate decision.

Thus, the record falls short for plaintiff at several crucial points. First, there is no basis on which a reasonable juror could find that Gadinas and Huffman were wrongfully motivated and that their budgetary concerns were pretextual. Nor are we satisfied that, under *Shockey*, an objectively reasonable juror could find from Nycum's hostile attitude, without more, that his concurrence in Gadinas's recommendation to downsize the program and eliminate both of the salaried staff positions was wrongfully motivated and pretextual. Finally, even assuming the wrongfulness of Nycum's motivation, the record viewed as whole does not support a reasonable inference that Nycum's concurrence in Gadinas's recommendation was a sufficient casual link to permit a jury to find that the discharge was wrongful. The trial court accordingly did not err in granting defendant's motion for summary judgment.

Affirmed.