Argued and submitted November 6, 2013; judgment on ADEA claim, state age discrimination claim, sexual orientation discrimination claim, First Amendment claim, and equal protection claim reversed and remanded; otherwise affirmed January 27, 2016

## Richard C. LA MANNA, III,
*Plaintiff-Appellant,*

*v.*

## CITY OF CORNELIUS,
an Oregon municipality,
*Defendant-Respondent.*

### Washington County Circuit Court
C106109CV; A149972

366 P3d 773

Stephen L. Brischetto argued the cause and filed the briefs for appellant.

Matthew J. Kalmanson argued the cause for respondent. With him on the brief was Hart Wagner, LLP.

Before Armstrong, Presiding Judge, and Egan, Judge, and Nakamoto, Judge pro tempore.

NAKAMOTO, J. pro tempore.

## NAKAMOTO, J. pro tempore

Plaintiff brought a combination of six state and federal claims against defendant City of Cornelius for unlawful employment practices after defendant required him to withdraw from consideration for hiring as a police officer. Plaintiff asserted a federal and a state claim that defendant engaged in age discrimination prohibited by the Age Discrimination in Employment Act (ADEA), 29 USC §§ 621-634, and ORS chapter 659A, respectively. Plaintiff also alleged a sexual orientation discrimination claim under ORS 659A.030. In addition, plaintiff asserted three claims under 42 USC section 1983, alleging violations of his right to freedom of association under the First Amendment to the United States Constitution and his rights to due process and equal protection under the Fourteenth Amendment to the United States Constitution. The trial court granted summary judgment for defendant on all of plaintiff's claims. Plaintiff appeals the resulting judgment, contending that the trial court misapplied the relevant summary judgment standards and that, under the correct standards, he raised triable issues of fact on all of his claims. We reverse and remand as to all of plaintiff's claims except his due process claim, on which we affirm.

We begin with the facts, which we state in the light most favorable to plaintiff, the nonmoving party. ORCP 47 C; *Jones v. General Motors Corp.*, 325 Or 404, 408, 939 P2d 608 (1997). In February 2010, plaintiff applied for employment as a police officer with defendant at the encouragement of his friend Rubenstein, defendant's chief of police. Plaintiff is gay, and he was 50 years old when he applied. He disclosed his date of birth to defendant on a supplemental application. Earlier in his career, plaintiff had worked as a sheriff's deputy for the Washington County Sheriff's Office for three years and, later, as a chief deputy in a management position for five years. He also unsuccessfully ran for Clackamas County Sheriff in 2008. Rubenstein publicly endorsed plaintiff's campaign, and his support for plaintiff was well known around defendant's police department.

Plaintiff was invited to an oral interview for the police officer position, which took place on March 19, 2010.

Plaintiff was interviewed by two members of the police department, Sergeant Noffsinger and Officer Russell, and a member of defendant's city council, Dalin. During the interview, Russell commented to plaintiff, "You are getting like me. You don't have a lot of foot chase left in you. We're getting up there." Plaintiff responded that he was in the best shape of his life. After the interview, in the waiting area outside the interview room, Russell told plaintiff, "I hope you're ready to work graveyard. You're getting a little long in the tooth for this, and I think of you more as an administrator than a police officer."

Later that day, plaintiff received a call from Rubenstein, who informed plaintiff that he had done well in the interview and that only one other applicant had scored higher than plaintiff on that day. Subsequently, plaintiff received a letter from the city congratulating him on passing the oral interview and advising him that he was invited back to complete mock scenario testing and an interview with the chief on April 10, 2010.

On April 5, however, plaintiff received a call from Rubenstein. Rubenstein informed plaintiff that someone had gotten the city manager, Waffle, "fired up" about plaintiff's application and that Waffle wanted plaintiff removed from the hiring process. Rubenstein said that Waffle had refused to tell him who had raised the issue with Waffle. Plaintiff and Rubenstein discussed whether plaintiff should withdraw from the hiring process, but Rubenstein ultimately told plaintiff to wait so that Rubenstein could look into the situation further.

The next day, plaintiff called Rubenstein to find out what to do. Rubenstein told plaintiff to go on as normal. Rubenstein said that plaintiff had done nothing wrong. Rubenstein was angry because he felt that the integrity of the hiring process and Rubenstein's own integrity were being called into question.

Subsequently, plaintiff called the police department and asked to move his testing from the morning to the afternoon of April 10. The person with whom he spoke expressed surprise that he would appear for the testing and said that she would get back to him. She did not call him back.

On April 7, Rubenstein called plaintiff and told him that he needed to withdraw his application. Rubenstein explained that he did not know why this was happening, but that Waffle had told Rubenstein that Rubenstein "could lose [his] job" if plaintiff did not withdraw. On April 8, as a result of Waffle's statements to Rubenstein, plaintiff sent an email to the city withdrawing from the hiring process.

The city made conditional offers of employment to four applicants in the police officer recruitment. Each of those applicants failed one of the required medical, psychological, or background checks. After those four attempts, Rubenstein determined that none of the remaining applicants had desirable qualifications and conducted two new hiring processes.

Waffle testified in deposition that he required plaintiff to withdraw from the hiring process because plaintiff's friendship with Rubenstein created the impression that favoritism had become part of the hiring process and that plaintiff's continued participation would have been detrimental to the morale of the department. He explained that plaintiff would not have been hired even if he was the best qualified candidate for the position. Waffle also conceded that he had not determined that Rubenstein had done anything to manipulate the hiring process and that plaintiff did nothing wrong in the hiring process. In addition, Waffle agreed that Rubenstein had not violated any city policy.

In fact, under city policy, an individual who has a relationship with another city employee "will be considered for employment in the same manner as other applicants." When an applicant has an intimate relationship with another city employee or is a relative of a city employee, the city nevertheless "will always try to select the most qualified person for each available job." Waffle conceded that an applicant who is a friend of a current employee is entitled to "no different or less consideration than a former employee, a relative, or a partner."

Thus, under the city's policy of hiring the best qualified applicant, Waffle conceded that, if plaintiff was the best qualified applicant, "he was entitled to the job." Nevertheless, Waffle testified, plaintiff was not considered

for the police officer position in the same manner as other applicants.

In the past, Rubenstein had recruited, and the city had hired, two other friends of Rubenstein. Both of those people were substantially younger than plaintiff and heterosexual.

As noted above, in addition to asserting that Waffle required plaintiff to withdraw to combat perceptions of favoritism in the hiring process, Waffle also asserted that plaintiff's participation in the hiring process was detrimental to the morale of the department. To understand that assertion, some background is necessary. During the hiring process at issue here, it was well known at the police department that Rubenstein's immediate subordinate, Commander Jensen, would soon retire. Noffsinger wanted that position, but Rubenstein had doubts about his ability to do the whole job, so Rubenstein was looking into alternatives to promoting Noffsinger, including splitting Jensen's responsibilities between Noffsinger and another person. The other person was reluctant to take a promotion to an administrative position. Rubenstein had openly discussed the possibility of hiring plaintiff to fill the open police officer position and then promoting him to the commander position when Jensen retired. Russell had also discussed that possibility with Officer Wellhouser and other officers before the hiring process.

Waffle explained that his decision to require plaintiff to withdraw was based on complaints from two people, Wellhouser and the city recorder, Roth. Wellhouser had learned of plaintiff's application from Russell and had discussed plaintiff with Russell shortly before the hiring process began. On the day of plaintiff's oral interview, Wellhouser complained to Waffle that plaintiff was the "Chief's buddy" and that his continued candidacy for the position looked like favoritism. Wellhouser testified that, on that occasion, he and Waffle were "just talking about hiring some people and stuff" and that Wellhouser "mentioned to [Waffle] that [plaintiff] had put in [for the police officer position], which I thought * * * was a little odd." Wellhouser told Waffle that plaintiff "had applied at Clackamas County for the Sheriff position, and [Waffle was] like, hum."

Roth first complained several days later. Her complaint was based on a third-hand understanding that Rubenstein had manipulated the hiring process by telling Noffsinger to advance more candidates to the next stage than originally contemplated. Plaintiff was ranked tenth or eleventh based on his oral interview scores. Defendant asserts that the original plan was to advance the top 10 candidates to the next stage, but that Rubenstein changed that number to 12 after he saw plaintiff's scores. Noffsinger reported to Jensen that Rubenstein had changed the number, and Jensen reported that information to Roth, who complained to Waffle. However, Waffle did not investigate that allegation before requiring plaintiff to withdraw from the process, and, as noted above, he conceded in his deposition that Rubenstein had not manipulated the process.

On the other hand, plaintiff points to evidence that permits an inference that the original plan was actually to advance the top 12 candidates and that Noffsinger—who, as described above, likely understood plaintiff's candidacy for the police officer position to decrease his chances of promotion to commander—attempted to change the number to 10 after Noffsinger saw where plaintiff was ranked.

On April 1, Roth made a second complaint by emailing Waffle, saying that there were "[b]ig issues in the PD, related to promotion, pressure to accept a promotion, training and shortage of staff, major OT. Officers are receiving hell from the Chief, over someone talking with you about [plaintiff]." Waffle was concerned that officers were "receiving hell from the Chief" and about the issue regarding promotions. After thinking about those concerns over the weekend, Waffle concluded that "I needed to tell Chief Rubenstein that [plaintiff] would not be hired. I have the final hiring authority, and [Rubenstein] should tell [plaintiff] to withdraw."

Most of defendant's employees who were deposed denied knowing that plaintiff was gay. Plaintiff had told Rubenstein of his sexual orientation, but Rubenstein testified that he told no one else. Wellhouser knew of plaintiff's sexual orientation, and he testified that he had learned of it at work, that is, from another of defendant's employees,

but that he did not remember from whom. Plaintiff's sexual orientation was discussed on the Internet during his campaign for sheriff in 2008, and a flyer suggesting that plaintiff was gay had been distributed around the Washington County Sheriff's Office while plaintiff worked there and again during his campaign for Clackamas County Sheriff.

As noted, plaintiff filed an action against defendant, alleging that defendant had discriminated against him on the basis of his age, sexual orientation, and constitutionally protected relationship with Rubenstein. Defendant moved for summary judgment on all of plaintiff's claims, contending that plaintiff could not show a genuine issue of material fact as to whether he was discriminated against on any of those grounds. The trial court agreed and granted summary judgment for defendant on all six of plaintiff's claims. Plaintiff appeals, contending that he raised a genuine issue of material fact as to discrimination on those three bases and that his due process and equal protection claims are merely follow-on claims that depend on a showing of discrimination based on his constitutionally protected relationship with Rubenstein. We consider each of plaintiff's claims in turn to determine whether there are any genuine issues of material fact and whether defendant was entitled to judgment as a matter of law. ORCP 47 C; *Jones*, 325 Or at 420.

## AGE DISCRIMINATION UNDER THE ADEA

We begin by considering plaintiff's claim that he suffered age discrimination in violation of federal law. The ADEA prohibits an employer from discriminating "because of [an] individual's age." 29 USC § 623(a). Unlike other federal employment-discrimination laws, the ADEA requires a plaintiff to prove at trial that age was the "but-for" cause of an employer's adverse employment action; it is not sufficient for a plaintiff to prove that "age was simply a motivating factor." *Gross v. FBL Financial Services, Inc.*, 557 US 167, 174, 129 S Ct 2343, 174 L Ed 2d 119 (2009). Since the Supreme Court decided *Gross*, several United States courts of appeal, including the United States Court of Appeals for the Ninth Circuit, have held that the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 US 792, 802,

93 S Ct 1817, 36 L Ed 2d 668 (1973), still applies in evaluating whether to grant summary judgment on an ADEA claim. *See Shelley v. Geren*, 666 F3d 599, 608 (9th Cir 2012) (so holding and collecting cases from other circuits).[1]

Under the *McDonnell Douglas* framework, courts analyze federal employment discrimination claims in a particular order. First, a plaintiff must establish a *prima facie* case of discrimination. To do so, a plaintiff must show that (1) the plaintiff is a member of a protected class; (2) the plaintiff applied and was qualified for a job for which the employer was seeking applicants; (3) despite his or her qualifications, the plaintiff was rejected; and (4) after the plaintiff's rejection, the position remained open and the employer continued to seek applications from people with the plaintiff's qualifications. *McDonnell Douglas*, 411 US at 802; *see also O'Connor v. Consolidated Coin Caterers Corp.*, 517 US 308, 312, 116 S Ct 1307, 134 L Ed 2d 433 (1996) (discussing fourth requirement in ADEA context). Once a plaintiff has done that, the burden of production shifts to the defendant to articulate a legitimate nondiscriminatory reason for its failure to hire the plaintiff. *Shelley*, 666 F3d at 608. If the defendant does that, the plaintiff must present evidence creating a genuine issue of fact as to whether the defendant's proffered reason is merely a pretext for unlawful discrimination. *Id.* The plaintiff may meet that burden "indirectly, by showing that the employer's proffered explanation is unworthy of credence because it is internally inconsistent or otherwise not believable, or *** directly, by showing that unlawful discrimination more likely motivated the employer." *Id.* at 609 (internal quotation marks omitted).

Here, defendant concedes that plaintiff presented a *prima facie* case of age discrimination by showing that he was 50 years old, he applied and was qualified for the police officer position, defendant required plaintiff to withdraw from the hiring process, and the hiring process continued

---

[1] Before the trial court, defendant contended that the Supreme Court's decision in *Gross* rendered the *McDonnell Douglas* framework inapplicable to ADEA claims. Relying on a district court decision to that effect that was later reversed by *Shelley*, the trial court agreed. On appeal, plaintiff contends, defendant concedes, and we agree, that *Gross* does not affect an ADEA claim at the summary judgment stage.

for others with qualifications similar to plaintiff's.[2] However, defendant argues that the evidence supporting its proffered nondiscriminatory reason for requiring plaintiff to withdraw from the hiring process—the perception that Rubenstein was manipulating the hiring process to favor his friends—is "overwhelming" and that plaintiff has failed to present direct evidence of age discrimination or sufficiently "substantial" and "specific" evidence that defendant's proffered explanation is a pretext. *Godwin v. Hunt Wesson, Inc.*, 150 F3d 1217, 1222 (9th Cir 1998).

For his part, plaintiff first contends that, on summary judgment, the trial court erred in looking further than his *prima facie* case. He asserts that the *McDonnell Douglas* framework is a federal procedural rule and that our equivalent state procedural rule on summary judgment in employment discrimination cases is a *"prima facie* only" approach under which, once a plaintiff has made a *prima facie* case, the question of the employer's motivation is always one for the jury. *See Snead v. Metropolitan Property & Cas. Ins. Co.*, 237 F3d 1080, 1090-93 (9th Cir), *cert den*, 534 US 888 (2001) (applying *McDonnell Douglas* framework to a state employment discrimination claim litigated in federal court on that ground). However, because, as explained below, we agree with plaintiff's alternative argument, we need not address that question here.[3]

---

[2] We note that plaintiff does not point to evidence of the ages of the four candidates to whom defendant made conditional offers of employment. Given that lack of information, it is difficult to assess the strength of an inference of discrimination that plaintiff's *prima facie* case may create. *See, e.g., O'Connor*, 517 US at 312 (discussing relative strength of inferences of age discrimination created by different *prima facie* cases); *Shelley*, 666 F3d at 608-09 (discussing details of inference of age discrimination from *prima facie* case). Because, as discussed below, plaintiff's pretext evidence creates a genuine issue of fact as to whether he was discriminated against because of his age, the relative strength of the inference of discrimination that arises from plaintiff's *prima facie* case does not affect our analysis in this case.

[3] The Oregon Supreme Court has rejected the *McDonnell Douglas* framework for claims brought under Oregon law. *City of Portland v. Bureau of Labor and Ind.*, 298 Or 104, 114-15, 690 P2d 475 (1984); *see also Hardie v. Legacy Health System*, 167 Or App 425, 434, 6 P3d 531 (2000), *rev den*, 332 Or 656 (2001) (explaining Supreme Court's rejection of burden-shifting analysis). However, neither we nor the Supreme Court has addressed whether the *McDonnell Douglas* framework is a federal procedural rule that does not apply in state courts. *See Durham v. City of Portland*, 181 Or App 409, 422-26, 45 P3d 998 (2002) (in an antidiscrimination action brought under Oregon antidiscrimination statutes, holding that

Plaintiff's alternative argument is that he has presented evidence sufficient to show both directly and indirectly that defendant's proffered explanation is false and that defendant's real reason for requiring plaintiff to withdraw was his age. He points to Russell's comments during and after plaintiff's oral interview as direct evidence that defendant discriminated against him based on his age. He also relies on his qualifications for the position, which, he asserts, were superior to those of other candidates. Plaintiff also argues that the evidence demonstrates that defendant's assertion that plaintiff was required to withdraw because of perceptions of favoritism is unworthy of credence. Specifically, plaintiff points out that, under defendant's policies, plaintiff was entitled to be considered for the police officer position in the same way as other candidates despite his friendship with Rubenstein and that Waffle admitted that, if plaintiff was the best qualified applicant, "he was entitled to the job." Moreover, plaintiff points out, defendant did not require two other friends of Rubenstein, both of whom were substantially younger than plaintiff, to withdraw from the hiring process. Instead, defendant hired both of those people.

We agree with plaintiff that the evidence permits an inference that he was required to withdraw because of his age. Plaintiff and defendant first disagree about the significance of Russell's comments about plaintiff's age, which plaintiff asserts are direct evidence of age discrimination. Defendant contends that Waffle was the sole decisionmaker in this case, and, accordingly, that Russell's comments were irrelevant. We disagree because, although Waffle testified that he was the decisionmaker, his decision was based on information that he received from Wellhouser and Roth. Russell, who made the comments about plaintiff's age, discussed plaintiff with Wellhouser before Wellhouser complained to Waffle. Russell also discussed plaintiff, and Rubenstein's purported manipulation of the hiring process, with Noffsinger and, subsequently, with Jensen, on whose information Roth's first complaint was based. Accordingly,

"differences in the order and presentation of evidence do not provide a reason why issue preclusion should not apply" to a federal court's rejection of the plaintiff's Title VII sex discrimination and retaliation claims).

Russell's opinion about plaintiff was part of Waffle's decisionmaking process. *See Poland v. Chertoff*, 494 F3d 1174, 1182 (9th Cir 2007) (even in a case involving an "independent decisionmaker," conduct of a biased subordinate can prove pretext if "the biased subordinate influenced or was involved in the decision or decisionmaking process"). Thus, even though they are not direct evidence of discriminatory motive on Waffle's part, Russell's comments contribute to an inference that the decision to require plaintiff to withdraw was based on his age.

As to plaintiff's evidence of pretext, defendant contends that it provides no more than general questions as to Waffle's credibility, which, defendant asserts, are insufficient to defeat a motion for summary judgment. We begin with plaintiff's evidence that, under city policy, friends of current city employees are entitled to consideration for a position in the same manner as other applicants. As we understand it, plaintiff's argument is that requiring plaintiff to withdraw from the process was not a logical response to a concern about perceptions of favoritism in the absence of a violation of city policy or a belief that Rubenstein had actually manipulated the process in some way. That is, in plaintiff's view, a factfinder can infer that Waffle and the people who complained to him about plaintiff's application had another reason to reject plaintiff because the complaints that Wellhouser and Roth made to Waffle did not demonstrate any wrongdoing by plaintiff or Rubenstein that, under city policy, would disqualify plaintiff from consideration for the position. *See Porter v. California Dept. of Corrections*, 383 F3d 1018, 1026-27 (9th Cir 2004), *modified on request for reh'g*, 419 F3d 885 (2005) (holding that deviations from established procedures may establish pretext and collecting similar cases from other circuits). As Waffle testified, under these circumstances, regardless of plaintiff's friendship with Rubenstein, if plaintiff was the best qualified applicant, he was entitled to the job, but he nevertheless was not considered for it.

In response, defendant contends that, rather than merely being concerned about *perceptions* of favoritism, Waffle actually believed that plaintiff "was getting special

treatment due to his friendship with Rubenstein." Viewed in that light, defendant argues, the city policy of considering all applicants equally does not undercut Waffle's explanation for his decision. Given that the procedural posture is summary judgment, that argument suffers from several problems. First, a trier of fact need not credit the city's argument; indeed, Waffle did not testify that he rejected plaintiff because he actually believed that plaintiff was getting special treatment. Waffle testified that he was concerned about perceptions of favoritism in the process, not that he believed that Rubenstein had actually manipulated the process. Moreover, any assertion to the contrary would conflict with other evidence that plaintiff points to in the record: Waffle's understanding of any manipulation of the process was based on only the third-hand information that Roth had relayed to him in her email, and, before making his decision, Waffle did no investigation to determine whether, in fact, Rubenstein had manipulated the process. At the time of his deposition, Waffle believed that Rubenstein had not manipulated the process. Given the testimony in the record, defendant's argument does nothing to undercut plaintiff's contention that Waffle's decision to remove plaintiff from the process cannot reasonably be explained on the ground of perceptions of favoritism because that decision—taken in the absence of any investigation of the rumors that Roth reported to Waffle—conflicted with defendant's policy of always hiring the best qualified applicant.

Defendant also argues that plaintiff's evidence that two of Rubenstein's younger friends had been hired in the past supports its view that Waffle had a legitimate reason to be concerned about perceptions of favoritism in the hiring process rather than bolstering plaintiff's contention that he was rejected because of his age. That determination, however, is one for a factfinder, not one for the court on summary judgment. As explained above, at this stage, we draw all permissible inferences in favor of plaintiff. Waffle testified that city policy is to hire the best qualified applicant, regardless of personal relationships that the applicant may have. Thus, Waffle's decision to remove plaintiff from the hiring process deviated from city policy. The fact that Waffle apparently did not deviate from city policy in hiring two other friends of

Rubenstein, both of whom were significantly younger than plaintiff, supports an inference that Waffle treated plaintiff differently because of his age. That it is also capable of supporting an inference that Waffle had become so concerned about perceptions of favoritism and department politics that he would violate city policy to avoid hiring a third friend of Rubenstein is immaterial to the analysis on summary judgment.

Although defendant does not directly address it, we briefly discuss Waffle's concern about dissension in the department, apart from perceptions of favoritism. Waffle's testimony indicates that his decision was motivated, in some part, by the concern that Roth expressed that Rubenstein would promote plaintiff over Noffsinger, which would create a difficult political situation in the department. That is not necessarily a legitimate nondiscriminatory reason for rejecting plaintiff. Plaintiff's age and experience made him a likely choice for the commander position and a less likely choice for the entry-level police officer position—as Russell expressly told plaintiff. The fact that Waffle's decision was based, in part, on a concern that plaintiff might be promoted over Noffsinger can lend some support to an inference that Waffle's decision was actually based on plaintiff's age.

In sum, plaintiff has presented substantial and specific evidence that would allow a factfinder to decide that defendant's assertion that plaintiff was not hired because of Waffle's concern about the perception of favoritism or dissension in the department is pretextual. Ultimately, it is undisputed that plaintiff was not hired because of some personal circumstance or characteristic rather than based on his qualifications. In light of Russell's comments; defendant's deviation from its policy of hiring the most qualified applicant; Noffsinger's, Roth's, and Waffle's concern that hiring plaintiff—whom Russell, at least, perceived as too old for the police officer job—might result in a disruption in the order of promotions; and defendant's hiring of two of Rubenstein's younger friends, a factfinder must decide whether the relevant personal characteristic was plaintiff's age. Thus, the trial court erred in granting summary judgment for defendant on plaintiff's ADEA claim.

## STATE AGE DISCRIMINATION

Under ORS 659A.030(1)(a), "[i]t is an unlawful employment practice * * * [f]or an employer, because of an individual's * * * age if the individual is 18 years of age or older * * * to refuse to hire or employ the individual or to bar or discharge the individual from employment." The parties agree that the *McDonnell Douglas* burden shifting analysis does not apply to plaintiff's state age discrimination claim. However, they disagree about the minimum that a plaintiff must show to avoid summary judgment.

Relying on some of our case law, plaintiff contends that, merely by showing the elements of a *prima facie* case of discriminatory failure to hire under *McDonnell Douglas*— (1) the plaintiff is a member of a protected class; (2) the plaintiff applied and was qualified for a job for which the employer was seeking applicants; (3) despite his or her qualifications, the plaintiff was rejected; and (4) after the plaintiff's rejection, the position remained open and the employer continued to seek applications from people with the plaintiff's qualifications—a plaintiff always creates a genuine issue of material fact as to whether the failure to hire was motivated by intentional discrimination, regardless of what evidence the defendant may present. *See Henderson v. Jantzen, Inc.*, 79 Or App 654, 657, 719 P2d 1322, *rev den*, 302 Or 35 (1986) (expressly adopting the *McDonnell Douglas* elements of the *prima facie* case and noting that the plaintiff's burden at summary judgment is "so minimal that it is virtually impervious to a motion based on evidentiary insufficiency" (internal quotation marks omitted)).

For its part, defendant contends that, under some of our other cases, a *prima facie* case under Oregon law is not merely a showing of the four *McDonnell Douglas prima facie* elements, but rather is evidence sufficient to allow a trier of fact to find that the defendant discriminated against the plaintiff. *See, e.g., Hardie v. Legacy Health System*, 167 Or App 425, 433-34, 6 P3d 531 (2000), *rev den*, 332 Or 656 (2001) ("[t]o establish a *prima facie* case" of retaliatory discrimination, the plaintiff had to show the elements of the statutory discrimination claim, including that the employer discriminated against the plaintiff because the plaintiff

invoked the workers' compensation system); *Durham v. City of Portland*, 181 Or App 409, 421-22, 45 P3d 998 (2002) (on a motion for summary judgment or directed verdict, "[v]iewing all the evidence in the light most favorable to the nonmoving party, [Oregon courts] ask whether the trier of fact reasonably could infer that the defendant discriminated against the plaintiff in the terms or conditions of work because of the plaintiff's sex, race, or other protected characteristic"); *id.* at 424 (at the third step of the *McDonnell Douglas* analysis, a federal court "reaches the question with which Oregon courts begin: [w]hether, on the record as a whole, the evidence permits a reasonable inference that the plaintiff was the victim of intentional discrimination").

We need not resolve the parties' disagreement here, however, because, as explained above in our discussion of the ADEA claim, 276 Or App at 159-62, plaintiff's evidence, considered as a whole, allows an inference that defendant discriminated against him because of his age. Thus, the trial court erred in granting summary judgment for defendant on plaintiff's state age discrimination claim regardless of whether plaintiff is correct that the court should have considered only that he showed the four *McDonnell Douglas prima facie* elements. Accordingly, we reverse and remand on plaintiff's state age discrimination claim.

## SEXUAL ORIENTATION DISCRIMINATION

We turn to plaintiff's sexual orientation discrimination claim. Under ORS 659A.030(1)(a), "[i]t is an unlawful employment practice * * * [f]or an employer, because of an individual's * * * sexual orientation * * * to refuse to hire or employ the individual or to bar or discharge the individual from employment." As we will explain, for reasons similar to those set out above regarding plaintiff's age discrimination claims, we conclude that defendant is not entitled to summary judgment on plaintiff's sexual orientation discrimination claim.

Defendant first contends, and we agree, that, if defendant had no knowledge of, or belief about, plaintiff's membership in a protected class—here, knowledge or belief that plaintiff was gay—then it could not have intentionally

discriminated against plaintiff because of his membership in that class.[4] *Cf., e.g., Woodman v. WWOR-TV, Inc.*, 411 F3d 69, 81-82 (2d Cir 2005) (concluding that, in an ADEA case, replacement of the plaintiff by someone significantly younger "can support a *prima facie* inference of discriminatory intent only if some evidence indicates defendant's knowledge as to the discrepancy" in ages; collecting cases to the same effect involving discrimination based on disability, race, pregnancy, and religion). Defendant argues that, here, Waffle was the only decisionmaker and plaintiff has not produced direct evidence that Waffle knew of plaintiff's sexual orientation. Accordingly, in defendant's view, plaintiff has not produced evidence allowing a trier of fact to find that defendant knew of plaintiff's sexual orientation, and, thus, defendant is entitled to summary judgment.

Because, in this case, the two issues are intertwined, we consider defendant's argument that defendant did not know of plaintiff's sexual orientation as part of our consideration of whether the record allows an inference that defendant discriminated against plaintiff on that basis. As we have explained, although Waffle ultimately made the decision to require plaintiff to withdraw from the hiring process, that decision was based on information from Wellhouser and Roth about plaintiff and the hiring process. Wellhouser knew of plaintiff's sexual orientation, and he discussed plaintiff, plaintiff's application for the police officer position, and plaintiff's run for sheriff with Waffle, in support of his view that plaintiff should not be hired. Even if a trier of fact cannot infer from that evidence that Wellhouser actually told Waffle that plaintiff was gay, Wellhouser's complaint to Waffle can support an inference that Wellhouser was a "biased subordinate" who "influenced or was involved in the decision or decisionmaking process." *Poland*, 494 F3d at 1182. We agree with the Ninth Circuit that, to show that defendant—the City of Cornelius—discriminated against him, plaintiff must show that his protected characteristic caused the discrimination; plaintiff is not required to show that the person who made the decision had the protected

---

[4] The record here contains no evidence that anyone believed anything about—as opposed to knowing of—plaintiff's sexual orientation. Accordingly, we confine our discussion to defendant's knowledge of plaintiff's sexual orientation.

characteristic in mind if that person or the decisionmaking process was influenced by a subordinate who was biased against the plaintiff because of the protected characteristic. Thus, by presenting evidence (1) that Wellhouser knew of plaintiff's sexual orientation and complained to Waffle about plaintiff during a conversation about "hiring some people and stuff," (2) that Wellhouser's complaint influenced Waffle's ultimate decision, and (3) that, as discussed above, 276 Or App at 160, Waffle decided to require plaintiff to withdraw rather than considering his application on its merits, contrary to city policy, plaintiff has provided evidence allowing an inference that defendant discriminated against plaintiff because of his sexual orientation.

Our conclusion that plaintiff's evidence is sufficient to support an inference of sexual orientation discrimination is further buttressed by the fact that defendant had hired two friends of Rubenstein who were heterosexual. As in the age discrimination claim, defendant's hiring of those two of Rubenstein's friends supports an inference that, contrary to defendant's assertion that Waffle required plaintiff to withdraw from the process because of his friendship with Rubenstein, defendant required plaintiff to withdraw because of his sexual orientation.

## FIRST AMENDMENT

Plaintiff also alleged that defendant violated 42 USC section 1983 by depriving him of his right to freedom of association under the First Amendment by requiring him to withdraw from the hiring process because of his relationship with Rubenstein. The elements of a First Amendment claim brought under section 1983 in the employment context are (1) the plaintiff engaged in constitutionally protected speech or association; (2) the defendant took an adverse employment action against the plaintiff; and (3) the plaintiff's speech or association was a substantial or motivating factor for the adverse employment action.[5] *Hudson v. Craven*, 403

---

[5] Other aspects of First Amendment claims, for example, that the plaintiff's speech must relate to a matter of public concern, the relative importance of the defendant's interest in promoting efficiency of public services, or whether political considerations are appropriate in hiring for a position, are not at issue here; accordingly, we do not discuss them. *See, e.g., Pickering v. Bd. of Educ.*, 391 US 563, 568, 88 S Ct 1731, 20 L Ed 2d 811 (1968); *Branti v. Finkel*, 445 US 507, 518,

F3d 691, 695 (9th Cir 2005); *see also Mt. Healthy City Board of Ed. v. Doyle*, 429 US 274, 287, 97 S Ct 568, 50 L Ed 2d 471 (1977) (in public employment retaliation claim based on exercise of First Amendment rights, a plaintiff must show that the plaintiff's conduct was constitutionally protected and that his conduct was a "motivating factor" in the adverse employment action; then the burden shifts to the employer to show that it would have reached the same decision absent the protected conduct).

Because the parties' arguments below inform our analysis of this claim on appeal, we set them out at some length. In its motion for summary judgment, defendant argued generally that plaintiff's relationship with Rubenstein was not constitutionally protected and, therefore, that plaintiff had failed to show that defendant interfered with a constitutionally protected interest by requiring plaintiff to withdraw based on his relationship with Rubenstein. Specifically with respect to an expressive association claim, that is, a claim that plaintiff's association with Rubenstein was protected because it was "for the purpose of engaging in those activities protected by the First Amendment— speech, assembly, petition for the redress of grievances, and the exercise of religion," *Roberts v. United States Jaycees*, 468 US 609, 618, 104 S Ct 3244, 82 L Ed 2d 462 (1984)— defendant contended primarily that "[n]othing in the record creates an inference that plaintiff's prior run for Clackamas County Sheriff in 2008 and Rubenstein's endorsement of his candidacy was a factor in Waffle's decision making during the 2010 hiring process."[6] That is, defendant argued that plaintiff had failed to show a causal link between defendant's hiring process and plaintiff's earlier run for sheriff

---

100 S Ct 1287, 63 L Ed 2d 574 (1980); *Biggs v. Best, Best & Krieger*, 189 F3d 989, 994-95 (9th Cir 1999) (discussing relationship between *Pickering* and *Branti* analyses).

[6] Defendant also argued, and reiterates on appeal, that plaintiff did not plead an expressive association theory in his complaint. We disagree. In his freedom of association claim, plaintiff alleged in detail the political aspects of his relationship with Rubenstein, including plaintiff and Rubenstein's joint support for a candidate for Washington County Sheriff and Rubenstein's public support for plaintiff's candidacy for Clackamas County Sheriff. He also alleged that defendant required him to withdraw his application because of his personal relationship with Rubenstein. Under the circumstances, plaintiff pleaded an expressive association claim.

and Rubenstein's support of him. Defendant did not argue that the run for sheriff and Rubenstein's support of plaintiff were not constitutionally protected. In response, plaintiff pointed to, among other things, Wellhouser's testimony that he had expressly informed Waffle of plaintiff's run for sheriff during his complaint to Waffle about plaintiff's candidacy, and, in Wellhouser's words, in response, Waffle "[was] like, hum."

At the hearing on the motion for summary judgment, defendant agreed that plaintiff's freedom of expression claim was that plaintiff had exercised his First Amendment right to run for sheriff and have Rubenstein support him and that defendant had asked him to withdraw his application because of that political activity. Based on that understanding of plaintiff's claim, defendant queried, "Where's the evidence that creates an inference that * * * the real reason [that Waffle required plaintiff to withdraw] was because back in 2008 [plaintiff] ran for sheriff and Rubenstein supported [him]?" Defendant argued that "[t]here isn't any." In response to plaintiff's reliance on Wellhouser's testimony, defendant argued that Wellhouser was merely telling Waffle "that he found it odd that someone who had run for sheriff was now applying to be a police officer on Cornelius's small force, which to Wellhouser's mind did not make sense as a career move." Accordingly, in defendant's view, Wellhouser's testimony about his discussion with Waffle of plaintiff's campaign for sheriff did not give rise to a factual dispute about the cause of Waffle's subsequent decision to require plaintiff to withdraw.

The trial court granted summary judgment for defendant, concluding that "[t]here is no evidence that Rubenstein and [plaintiff] were associating for the purpose of engaging in an expressive activity protected by the First Amendment at the time of [plaintiff's] application for employment" and that "[a] reasonable trier of fact could not find that [plaintiff's] application was denied because he had previously run for public office."

On appeal, plaintiff disagrees with both of those conclusions. With respect to the nature of his relationship with Rubenstein, plaintiff points to evidence in the record that

Rubenstein and plaintiff had engaged in expressive association for political purposes in the past, that that association was well known around defendant's police department, and that defendant's expressed reason for requiring plaintiff to withdraw was his ongoing relationship with Rubenstein. Plaintiff also argues that that evidence, in addition to the evidence of Wellhouser's discussion with Waffle of plaintiff's campaign for sheriff and defendant's disregard of its policies, creates a question of fact as to whether Waffle required plaintiff to withdraw because of his campaign for sheriff and his political association with Rubenstein.

For its part, defendant now contends that, as a matter of law, plaintiff and Rubenstein's relationship cannot be constitutionally protected because the two "were not part of a 'group' or a 'club' that formed, in part, for expressive purposes; they were casual friends who shared an interest in both law enforcement and politics." To the extent that defendant contends that Rubenstein's political association with plaintiff is not constitutionally protected because it involved only two people, not a larger group, defendant is mistaken. Support of one individual's run for office by another individual can create a protected expressive relationship. *See, e.g., Erickson v. Pierce County*, 960 F2d 801, 804-05 (9th Cir), *cert den*, 506 US 1035 (1992) (the right of the plaintiff, an employee in the prosecutor's office, to support her supervisor in a campaign for prosecutor "unquestionably is deserving of constitutional protection"); *Sowards v. Loudon County, Tenn.*, 203 F3d 426, 432 (6th Cir), *cert den*, 531 US 875 (2000) ("Support of a political candidate falls within the scope of the right of political association. Therefore, [the plaintiff] was exercising her constitutionally protected right of political association by supporting her husband's campaign for the office of Sheriff of Loudon County." (Internal citation omitted.)). *Cf. Fleisher v. City of Signal Hill*, 829 F2d 1491, 1500 (9th Cir 1987), *cert den*, 485 US 961 (1988) (where the plaintiff's employment was terminated because of his sexual relationship with an underage volunteer, the termination did not violate the plaintiff's right to freedom of expressive association because the plaintiff and the volunteer "did not associate with a view toward any [political, social, economic, educational, religious, or cultural] goals").

Defendant also argues that plaintiff's claim fails because plaintiff and Rubenstein's political association had taken place in the past and was not ongoing at the time of the hiring process—that is, although plaintiff and Rubenstein remained friends, they had not recently campaigned together. However, the relevant question is not, as defendant would have it, whether, at the precise time of the adverse employment action, plaintiff and Rubenstein were engaging in a political campaign or meeting with some set frequency to discuss political topics. The question is whether the constitutionally protected political association between plaintiff and Rubenstein—whether it took place on the day of the adverse employment action or several years before— was the cause of the adverse employment action. *See, e.g., Hatcher v. Board of Public Educ. and Orphanage*, 809 F2d 1546, 1558-59 (11th Cir 1987) (reversing grant of summary judgment for the defendant where questions of material fact remained as to whether the plaintiff's participation in protests during the 1983-84 school year had caused the district to demote her and subsequently not promote her to positions that became available during the 1984-85 school year). While a showing of temporal proximity may help a plaintiff show causation, *see, e.g., Sowards*, 203 F3d at 434 (noting "abrupt change" in the plaintiff's work environment after her husband announced his political campaign), the fact that the political association took place in the past is immaterial if plaintiff has also showed that it caused defendant to require him to withdraw from the hiring process.

That takes us to the trial court's second conclusion, namely, that plaintiff's evidence did not create a question of fact on causation. In that regard, defendant reiterates the arguments it made below, contending that there is support in the record for its view that Waffle's decision was not based on plaintiff's political association with Rubenstein. Those arguments misapprehend the summary judgment standard. The question was for the trial court, and is for us on appeal, whether the evidence, viewed in the light most favorable to plaintiff, allows an inference that Waffle required plaintiff to withdraw because of the politically expressive aspects of his relationship with Rubenstein. Among other evidence, plaintiff presented evidence that (1) Waffle knew of Rubenstein's

public support for plaintiff's campaign; (2) shortly before Waffle decided to require plaintiff to withdraw, Wellhouser told Waffle that he should not hire plaintiff and that plaintiff had run for sheriff and Waffle responded, "hum"; and (3) Waffle's stated reason for requiring plaintiff to withdraw was plaintiff's relationship with Rubenstein. Viewed against the backdrop of plaintiff's evidence that Waffle's actions contradicted city policy, 276 Or App at 160, that evidence allows an inference that Waffle required plaintiff to withdraw because of his political relationship with Rubenstein. Accordingly, defendant was not entitled to summary judgment on plaintiff's First Amendment claim.

## DUE PROCESS

We understand plaintiff's due process theory to be that plaintiff had a First and Fourteenth Amendment liberty interest in his politically expressive relationship with Rubenstein and that, by requiring him to withdraw from the hiring process, defendant deprived him of that interest without notice or the opportunity for a hearing. The problem with that claim is that plaintiff does not explain, nor do we perceive, how defendant deprived plaintiff of his political relationship with Rubenstein by rejecting his application for the police officer position. Although defendant deprived plaintiff of the opportunity to become a police officer with defendant, plaintiff has not alleged that defendant prevented plaintiff from continuing his relationship—political or personal—with Rubenstein. Plaintiff does not assert that he had any constitutionally protected interest in the police officer position itself or that defendant's failure to consider him for the position resulted in any stigma that impaired his ability to find other work in his profession. *See generally Board of Regents v. Roth*, 408 US 564, 576, 92 S Ct 2701, 33 L Ed 2d 548 (1972) (discussing requirements for a violation of due process in the employment context). Accordingly, the trial court did not err in granting summary judgment for defendant on plaintiff's due process claim.

## EQUAL PROTECTION

Plaintiff also claims that defendant violated his right to equal protection of the laws under the Fourteenth

Amendment by infringing on his right to expressive association under the First Amendment. Before the trial court, defendant contended that the equal protection claim turned on whether, in his First Amendment claim, plaintiff had demonstrated that his right to freedom of association was infringed. Plaintiff agreed that the Equal Protection claim depended on the First Amendment claim, but disagreed with defendant that defendant had not violated his First Amendment rights. After granting summary judgment for defendant on plaintiff's First Amendment claim, the trial court did the same on the equal protection claim without explanation.

On appeal, plaintiff again contends that the equal protection claim depends on the First Amendment claim and, accordingly, that summary judgment on the equal protection claim should be reversed. Given that the claim was litigated below exclusively as a follow-on to the First Amendment claim and that the trial court erroneously granted summary judgment on the First Amendment claim, we agree with plaintiff. *See OSU Student Alliance v. Ray*, 699 F3d 1053, 1067 (9th Cir 2012), *cert den*, 134 S Ct 70 (2013) (where the plaintiffs had alleged an equal protection claim based solely on the defendant University's infringement on the fundamental right to free speech, "the University's differential treatment of plaintiffs will draw strict scrutiny (as opposed to rational basis review) under the Equal Protection Clause only if it impinged plaintiffs' First Amendment rights"); *see also A.C.L.U. of Nevada v. City of Las Vegas*, 466 F3d 784, 797-98 (9th Cir 2006) (degree of scrutiny under equal protection depends on whether First Amendment right was violated); *Monterey Cnty. Dem. Cent. Comm. v. U.S. Postal Serv.*, 812 F2d 1194, 1200 (9th Cir 1987) (noting, with regard to "equal protection claims relating to expressive conduct," that "[o]nly when rights of access associated with a public forum are improperly limited may we conclude that a fundamental right is impinged").[7] As explained above, the trial

---

[7] Defendant has not asserted, below or on appeal, that plaintiff was not treated differently than other similarly situated applicants for the police officer position or that plaintiff has not shown that defendant improperly limited a right of access associated with a public forum. Nor did the trial court apparently consider those questions. Accordingly, we do not consider them.

court erred in granting summary judgment on the First Amendment claim based on its conclusion that plaintiff's evidence did not allow a determination that defendant had infringed any right to expressive association. It also erred in granting summary judgment on the equal protection claim based on the same reasoning.

## CONCLUSION

In sum, the trial court erred in granting summary judgment on plaintiff's ADEA claim, state age discrimination claim, sexual orientation discrimination claim, First Amendment claim, and equal protection claim. In all of those claims, plaintiff's evidence demonstrated the existence of genuine issues of material fact for trial. The court did not err in granting summary judgment on plaintiff's due process claim because plaintiff did not show that he had a constitutionally protected interest in the police officer position.

Judgment on ADEA claim, state age discrimination claim, sexual orientation discrimination claim, First Amendment claim, and equal protection claim reversed and remanded; otherwise affirmed.

---

On appeal, defendant does assert, briefly, that a "class-of-one" claim, which defendant contends that plaintiff is making here, is not available in the public employment context. *Engquist v. Oregon Dept. of Agriculture*, 553 US 591, 605, 128 S Ct 2146, 170 L Ed 2d 975 (2008). Regardless of whether we may properly consider the merits of that argument, which defendant makes for the first time on appeal, *see Outdoor Media Dimensions, Inc. v. State of Oregon*, 331 Or 634, 659, 20 P3d 180 (2001) (discussing requirements for alternative bases for affirmance), we briefly note that plaintiff's equal protection claim is not a "class-of-one" claim. In a "class of one" claim, a plaintiff does not allege that she belongs to a protected class or that the defendant has trammeled her fundamental rights; she asserts merely that she was treated differently from others without any rational reason. *Engquist*, 553 US at 601-02. Instead, as described above, here, plaintiff's claim depends on the premise that defendant improperly infringed his fundamental right to freedom of association under the First Amendment.