DEHOOG, P.J.
*18 Plaintiff is a licensed electrician who previously worked for defendant, Nike, Inc., in its maintenance department. Defendant fired plaintiff after he used one of defendant's on-site basketball courts at a prohibited time. In response, plaintiff sued defendant for, among other things, statutory safety complaint and whistleblower retaliation. Plaintiff alleged that defendant's explanation for terminating his employment was a pretext, and that the real reason that defendant discharged him was to retaliate for safety complaints that he had made about defendant's electrician apprenticeship program. Defendant responded that its decision to fire plaintiff resulted from an independent investigation, unrelated to plaintiff's safety complaints.
On appeal, plaintiff argues that, in light of evidence that his supervisors possessed a retaliatory motive and improperly influenced the investigation, the trial court erred in refusing his request for a special jury instruction. Specifically, plaintiff contends that he was entitled to have the jury instructed on a "cat's paw"[1] theory, which would have allowed his supervisors' improper motives to be imputed to the corporate decision-maker who ultimately fired him. Defendant disagrees, arguing that the cat's paw instruction was not warranted and that, because the court's instructions on corporate agency and substantial factor causation adequately instructed the jury regarding plaintiff's theory of liability, the court did not err even if the requested instruction was warranted. For the reasons that follow, we conclude that the trial court erred in failing to give plaintiff's requested instruction. Accordingly, we reverse and remand.
In reviewing whether a trial court has erred in denying a requested jury instruction, we consider the evidence at *19 trial and any resulting inferences in the light most favorable to giving the instruction. *58 Jett v. Ford Motor Company , 192 Or.App. 113, 120, 84 P.3d 219, rev. den. , 337 Or. 160, 94 P.3d 876 (2004). If, after review, we conclude that the trial court has erred, we consider the record as a whole to determine whether the error was nonetheless harmless. See id. at 118, 84 P.3d 219. We state the facts consistently with those standards.
In 2007, defendant hired plaintiff, a licensed electrician, to work in its maintenance department. In 2009, defendant established an electrician apprenticeship program (EAP) so that several of its employees could obtain a Limited Maintenance Electrician license. Consistent with various state law requirements, defendant's program required each apprentice to take classes at Portland Community College (PCC) and to complete 4,000 hours of on-the-job training under the supervision of a licensed electrician. PCC's Metro Limited Maintenance Electrician Joint Apprentice Training Committee (JATC) administered the program.
Shortly after defendant commenced its apprenticeship program, plaintiff discovered that apprentices were working without the direct supervision required for all on-the-job training hours. Plaintiff reported safety concerns related to the apprentices working without supervision to individuals in defendant's chain of command. First, plaintiff spoke with his direct supervisor, Dan Delgado, who managed the EAP. Then, in May 2011, plaintiff shared multiple safety concerns with Nellie St. Jacques, defendant's facilities director. In addition to his concerns about the EAP, plaintiff mentioned to St. Jacques that some employees in the maintenance department had been drinking at lunch and then driving company vehicles. St. Jacques addressed the employee drinking issue by firing five maintenance department employees, but she did not address plaintiff's complaint about the EAP.
In the following months, two workplace incidents raised further concerns for plaintiff. Each incident involved electrical work by unsupervised apprentices that, in plaintiff's view, had created a substantial risk of electrocution or other serious injury to the apprentices or to other workers. Plaintiff shared his concerns regarding the lack of direct *20 supervision with Delgado. Plaintiff and a fellow electrician, Shawn Hodson, later raised their safety concerns with Stephanie Hammer, defendant's risk manager for environmental safety. The investigation that followed was limited to getting Delgado's assurances that the EAP was in compliance with state regulations. Plaintiff and Hodson also made the same safety complaints to Deb Hellmer-Steele, who was the senior director of global corporate services and St. Jacques's superior. Hellmer-Steele responded by directing St. Jacques to investigate those complaints. But, as with each of the previous complaints, plaintiff did not observe any significant changes in response to his concerns.
In December 2011, defendant hired Mark Treppens as its maintenance operations manager. After being hired, Treppens learned of plaintiff's safety concerns and later wrote an email to himself noting that an apprentice had reported overhearing plaintiff and Hodson discuss plans to file a complaint with Oregon Occupational Safety and Health Administration (OSHA).[2] One of Treppens's first tasks in his new position was to replace a supervisor fired by St. Jacques in response to plaintiff's report about employee drinking. Treppens told plaintiff that he had no chance of getting the supervisor position himself "because of the past." Plaintiff understood Treppens's mention of "the past" to refer to his past safety complaints. Plaintiff conveyed to St. Jacques what Treppens had said about the promotion, prompting Treppens to call plaintiff into his office where he denied having made the remark. Although Treppens later interviewed plaintiff for the supervisor position, he ultimately passed him over for the promotion.
In February 2012, Hodson resigned. In an exit interview with Randi Miller, an employee relations manager, Hodson again expressed concerns regarding the EAP. Miller asked plaintiff about Hodson's complaints and plaintiff confirmed that they were valid. After resigning, Hodson filed safety complaints regarding the program with both Oregon OSHA and JATC. In May 2012, JATC
*59 followed *21 up with a site visit to the Nike campus to review the EAP. During the site visit, Delgado told Katrina Cloud, the JATC administrator, that he intended to continue operating the EAP according to "business as usual," and that he did not plan any changes in the program to address the safety concerns that plaintiff and others had raised. Following Cloud's visit, plaintiff contacted her and repeated his safety concerns directly to her; he also filed his own safety complaint with Oregon OSHA.
On December 27, 2012, the Nike campus was in "PowerDown" mode for the holidays, and most buildings on campus were closed. Plaintiff had taken a vacation day but was called into work because two contractors could not access the "Bo Jackson" building to complete a maintenance project. After reviewing their work, plaintiff invited the contractors to shoot baskets in the Bo Jackson gym. Plaintiff used his employee badge to gain access to that part of the building. When the three entered the gym, they noticed that the floor had recently been varnished but concluded that their use would not damage the floor, because it was no longer tacky. They were joined by plaintiff's son, who lived nearby, and the four shot baskets for about 20 minutes.
On January 7, 2013, Delgado and Treppens asked plaintiff to explain what he had been doing in the Bo Jackson gym during PowerDown, and implied that the gym floor had been damaged by his use. Plaintiff ultimately acknowledged that he had used his access badge to allow the others to play basketball, but denied that they had damaged the floor. Two days later, Delgado and Treppens called plaintiff into another meeting, which ended with plaintiff agreeing to resign his position with Nike. Later that day, however, plaintiff and his wife went to the employee relations department and told Miller that he had resigned only because he felt coerced, and that he wanted to rescind his resignation. Miller responded that, if plaintiff did not want to resign, he would be fired, but told him that he could appeal that decision within Nike. Plaintiff pursued that appeal and was placed on paid suspension while Miller conducted an investigation into the grounds for his termination. As further explained below, Miller's investigation consisted primarily of obtaining information from Treppens and Delgado, whom *22 plaintiff alleged to be motivated to retaliate against him for his safety complaints. Despite plaintiff's retaliation claims, Miller's investigation led her to conclude that plaintiff's termination had been justified, because he had committed a serious breach of trust and violated defendant's code of ethics and other corporate policies by using the Bo Jackson gym when it was closed. Ultimately, however, St. Jacques made the final decision to terminate plaintiff, based in part on Miller's findings and in part on information that St. Jacques herself obtained directly from Treppens. St. Jacques did not interview plaintiff.
After St. Jacques fired plaintiff, he sued defendant and asserted four claims: (1) safety complaint retaliation under ORS 654.062(5) ; (2) whistleblower retaliation under ORS 659A.199 ; (3) common law wrongful discharge; and (4) a state law wage and hour claim. The parties settled plaintiff's wage and hour claim and defendant successfully moved for summary judgment on plaintiff's common law claim, leaving only the statutory retaliation claims for trial. In support of those claims, plaintiff alleged multiple adverse employment actions by defendant, including, among other actions, denying him a promotion to supervisor and terminating his employment. As to St. Jacques's ultimate decision to uphold his termination, plaintiff presented alternative theories as to how that decision had been retaliatory: Either St. Jacques herself had held a retaliatory motive to terminate plaintiff because of his earlier internal and external safety complaints, or, if St. Jacques had not personally harbored a retaliatory motive, then she had based her decision to terminate him on information provided by Treppens and Delgado, who themselves were motivated to retaliate against him for those reasons.
Before trial, plaintiff requested a special jury instruction entitled "Imputation of Subordinate Bias." According to plaintiff, his requested instruction was warranted in light of his cat's paw theory of retaliation, namely, that Treppens and Delgado had improperly *60 influenced St. Jacques's ultimate decision to terminate his employment. Following discussions with the court, the parties settled on the following instruction:
*23 "Imputation of Subordinate Bias
"Nike contends that Nellie St. Jacques was Nike's principal decision-maker regarding [plaintiff's] termination. You may impute to Ms. St. Jacques any biased retaliatory motive against [plaintiff] held by a subordinate of Ms. St. Jacques's at Nike, if you find that her adverse employment decision was not actually independent because a subordinate had a biased retaliatory motive against [plaintiff] and that [the] same subordinate influenced, affected, or was involved in the adverse employment decision against [plaintiff]."
Despite having agreed to that language at the start of trial, defendant objected to plaintiff's instruction before it could be given at the end of trial. In light of defendant's objection, the trial court elected not to give the instruction. The court observed that it was unaware of any Oregon appellate decision embracing a cat's paw theory in connection with a state employment law claim and that, in its view, plaintiff could argue his theory of liability under other instructions that the court intended to give regarding corporate agency and substantial factor causation. Plaintiff timely excepted to that ruling. Following deliberations, the jury returned a verdict in favor of defendant on both retaliation claims.
Before addressing the merits of plaintiff's assignment of error, we consider defendant's contention that plaintiff invited the error he raises on appeal. Defendant argues that plaintiff invited error by choosing not to argue a cat's paw theory in closing despite the trial court's invitation to argue that theory without the special jury instruction. Plaintiff responds that, by requesting the special jury instruction and taking exception to the trial court's refusal to give it, he did all that was required to preserve the error for appeal. See ORCP 59 H. We agree. It is true, that, under the invited-error doctrine, "a party who 'was actively instrumental in bringing about' an alleged error 'cannot be heard to complain, and the case ought not to be reversed because of it.' " State v. Kammeyer , 226 Or.App. 210, 214, 203 P.3d 274, rev. den. , 346 Or. 590, 214 P.3d 822 (2009) (quoting Anderson v. Oregon Railroad Co ., 45 Or. 211, 216-17, 77 P. 119 (1904) ). "The doctrine is generally applicable when a party has invited the trial court to rule in a particular way under circumstances *24 that suggest that the party will be bound by the ruling[.]" Id . (citing State v. Ferguson , 201 Or.App. 261, 270, 119 P.3d 794 (2005), rev. den. , 340 Or. 34, 129 P.3d 183 (2006) ). "The goal of the rule is to ensure that parties who make intentional or strategic trial choices do not later 'blame the court' if those choices prove to be unwise." Id . (quoting Crawford v. Jackson , 252 Or. 552, 555, 451 P.2d 115 (1969) ). In the context of instructional error, a party may invite error by acquiescing to an instruction given by the trial court. State v. Saunders , 221 Or.App. 116, 122, 188 P.3d 449, rev. den. , 345 Or. 416, 197 P.3d 1105 (2008). Here, however, plaintiff both objected to the trial court's refusal to give a cat's paw instruction and provided the court with the language that he believed the law and evidence supported. Moreover, contrary to defendant's apparent contention, plaintiff does not appear to have made a strategic choice in not arguing a cat's paw theory through the other instructions that the court did give. In fact, as we explain below, the trial court's corporate agency instruction effectively precluded that argument. Under such circumstances, plaintiff did not invite the error he now raises.
Turning to the merits, Oregon law recognizes two types of error regarding jury instructions: (1) error in failing to give a proposed jury instruction and (2) error in the jury instructions that were actually given. Williams v. Philip Morris Inc. , 344 Or. 45, 55-56, 176 P.3d 1255 (2008), cert. dismissed , 556 U.S. 178, 129 S.Ct. 1436, 173 L.Ed.2d 346 (2009) (citing Bennett v. Farmers Ins. Co. , 332 Or. 138, 152-53, 26 P.3d 785 (2001) ). Plaintiff's appeal raises the first type of error-the trial court declined to give his requested instruction. As a general rule, parties to an action are entitled to have the jury instructed regarding their theories of the case "if their requested instructions correctly *61 state the law, are based on the current pleadings in the case, and are supported by evidence." Hernandez v. Barbo Machinery Co. , 327 Or. 99, 106, 957 P.2d 147 (1998). There is, however, no error in failing to give an otherwise proper jury instruction if the substance of the proposed instruction was fully covered by the other jury instructions given by the trial court. Id . Moreover, a failure to give the jury a properly requested jury instruction is reversible error only if the given instructions, considered as a whole, caused prejudice to the party who requested the instruction. Id. *25 Accordingly, our first inquiry is whether plaintiff's proposed instruction was a correct statement of law. Plaintiff argues that the trial court erred in concluding that, because no Oregon court had adopted the cat's paw theory by the time of trial, his proposed instruction was not a correct statement of law. He contends that, even on matters of first impression, a party is entitled to an instruction on its theory of the case unless the proposed instruction is either at odds with a general rule of Oregon law or inconsistent with a specific application of that rule in an earlier decision. See Montara Owners Assn. v. La Noue Development, LLC , 357 Or. 333, 347-48, 353 P.3d 563 (2015). In response, defendant espouses the trial court's reasoning, arguing that, "because the 'cat's paw' doctrine has not been adopted by any Oregon state court, it is axiomatic that it was not error for the trial court to refrain from giving this novel instruction[.]" (Emphasis in original.) However, we agree with plaintiff that the trial court was required to discern the applicable law even if plaintiff's theory presented a matter of first impression. See Employers Insurance of Wausau v. Tektronix, Inc. , 211 Or.App. 485, 515, 156 P.3d 105, rev. den. , 343 Or. 363, 169 P.3d 1268 (2007) (concluding that trial court erred in instructing the jury as to which party bore the burden of proving that an exception to an insurance policy exclusion applied, even though issue was one of first impression). Moreover, as we explain below, we are not wholly persuaded that the issue presented in this case is, in fact, as novel as the parties and the court apparently believed at trial.
In determining whether plaintiff's proposed jury instruction was a correct statement of law, we begin by considering the text, context, and any pertinent legislative history of the underlying statutes with the aim of discerning the legislature's intentions. State v. Gaines , 346 Or. 160, 171-72, 206 P.3d 1042 (2009). We start with the text and context of the statutory provisions, because that is the best indication of the legislature's intentions. State v. Walker , 356 Or. 4, 13, 333 P.3d 316 (2014). At this stage, we consider any prior constructions of the statutory text by the Oregon Supreme Court or by us, Liberty Northwest Ins. Corp., Inc. v. Watkins , 347 Or. 687, 692, 227 P.3d 1134 (2010), as well as context, which "includes related statutes and case law."
*26 State v. Vanburen , 262 Or.App. 715, 723-24, 337 P.3d 831 (2014) (citing State v. Klein , 352 Or. 302, 309, 283 P.3d 350 (2012) ).
As noted, plaintiff tried two statutory retaliation claims to the jury: (1) a claim of safety complaint retaliation under ORS 654.062(5) and (2) a whistleblower claim under ORS 659A.199. Under ORS 654.062(5), it is
"an unlawful employment practice for any person to bar or discharge from employment or otherwise discriminate against any employee * * * because the employee * * * has:
"(a) Opposed any practice forbidden by ORS 654.001 to 654.295, 654.412 to 654.423 and 654.750 to 654.780 ;
"(b) Made any complaint *** related to ORS 654.001 to 654.295 [.]"[3]
(Emphasis added.) The employee activities protected by ORS 654.062(5) include those listed under ORS 654.062(2), which allows
"any employee *** [to] complain to the Director of the Department of Consumer and Business Services *** of any violation of law, regulation or standard pertaining to safety and health in the place of employment, *62 whether or not the employee also notifies the employer."
Plaintiff contends that his proposed special jury instruction correctly articulates the causal connection that he must establish to make out a claim under ORS 654.062(2), that is, what it means for an employer to take an adverse employment action "because" an employee has engaged in activity protected by that statute.
Notably, the legislature has not defined the term "because" as it appears in ORS 654.062(5). In construing the term, then, we first consider the plain meaning of "because." State v. Dickerson , 356 Or. 822, 829, 345 P.3d 447 (2015) ("When the legislature does not provide a definition of a statutory term, we ordinarily look to the plain meaning of the statute's text to determine what particular terms mean."). The most apt definition of "because" seems to be "for the reason that" or "on account of the cause that." Webster's Third *27 New Int'l Dictionary 194 (unabridged ed. 2002); see Jenkins v. Board of Parole , 356 Or. 186, 194, 335 P.3d 828 (2014) (where "the legislature has not expressly defined the words ***, dictionary definitions *** can be useful"). And a "reason," in turn, is defined as "a consideration, motive, or judgment *** leading to an action or course of action." Webster's at 1891. Here, therefore, the use of "because" appears to require some degree of causal relationship between two elements of plaintiff's first retaliation claim, where one is an adverse employment action and the other is a protected activity, such as making a safety complaint. Thus, the legislature's use of "because" in ORS 654.062(5) required plaintiff to establish that his safety complaints somehow motivated or otherwise led to defendant's decision to pass him over for a promotion or terminate his position; that is, he was required to prove that "he [had been] subject to an unlawful employment practice because he made a complaint related to unsafe working conditions." Butler v. Dept. of Corrections , 138 Or.App. 190, 202, 909 P.2d 163 (1995) (emphasis added).
Similarly, under ORS 659A.199(1),
"[i]t is an unlawful employment practice for an employer to discharge, demote, suspend or in any manner discriminate or retaliate against an employee with regard to promotion, compensation or other terms, conditions or privileges of employment for the reason that the employee has in good faith reported information that the employee believes is evidence of a violation of a state or federal law, rule or regulation."
(Emphasis added.) Like the word "because" in ORS 654.062(5), the legislature has not defined "for the reason that" as it appears in ORS 659A.199. As we have just discussed, however, "for the reason that" is synonymous with "because." Webster's at 194. So, as used in ORS 659A.199, that phrase similarly appears to require a causal connection between employment discrimination or retaliation and an employee's good faith report of a violation of state or federal law, rule, or regulation. Accordingly, under both of plaintiff's statutory theories of liability, he was required to establish a causal link between his complaints about safety or the violation of a law, rule, or regulation, on the one hand, and defendant's adverse employment actions, on the other.
*28 We recognize that the plain meaning of the statutory text does not immediately answer the question whether an employer's adverse employment action is taken "because" of an employee's protected conduct when the ultimate decisionmaker is not necessarily biased, but the employee shows that a biased supervisor influenced or was involved in the decision. However, as the discussion that follows shows, we find considerable guidance to that question in our case law.
We have previously considered the causation requirement found in ORS 654.062(5) and similar statutes. Our decisions recognize that employment retaliation claims incorporate the tort principle of causation by requiring proof that the employee's protected activity was a substantial factor in the employer's adverse decision. See, e.g. , Estes v. Lewis and Clark College , 152 Or.App. 372, 381-82, 954 P.2d 792, rev. den. , 327 Or. 583, 971 P.2d 411 (1998) (considering whether a wrongfully motivated administrator's recommendation to down-size the plaintiff's program was so influential in ultimate decision to eliminate the plaintiff's position as to have *63 been a substantial factor in her discharge); Herbert v. Altimeter, Inc. , 230 Or.App. 715, 725, 218 P.3d 542 (2009) (applying substantial factor causation standard to retaliation claims under ORS 654.062(5) ). Further, to be a substantial factor, an employer's wrongful purpose must be a factor that "made a difference" in the adverse employment decision. Hardie v. Legacy Health System , 167 Or.App. 425, 435-36, 6 P.3d 531 (2000), rev. den. , 332 Or. 656, 36 P.3d 973 (2001) (citing Estes , 152 Or.App. at 381, 954 P.2d 792, and concluding that the plaintiff established prima facie case of employment discrimination where recommendation of supervisor with discriminatory motive "made a difference" in manager's decision to discharge the plaintiff). Here, plaintiff's proposed cat's paw instruction was consistent with that case law applying the substantial factor standard. See Employers Insurance of Wausau , 211 Or.App. at 514, 156 P.3d 105 (stating that parties are entitled to jury instructions that are consistent with established principles of Oregon law). Thus, contrary to the trial court's apparent understanding, the theory underlying plaintiff's requested jury instruction was not entirely novel at the time of trial.
Moreover, to the extent that cases like Estes and Hardie stopped short of holding that, under appropriate *29 circumstances, a subordinate's bias can be imputed to an otherwise independent decision-maker, we have now explicitly reached that conclusion in two recent employment law decisions, La Manna v. City of Cornelius , 276 Or.App. 149, 366 P.3d 773 (2016), and LaCasse v. Owen , 278 Or.App. 24, 373 P.3d 1178 (2016). Although neither case expressly uses the term "cat's paw," both hold that the wrongful motives of a subordinate can be imputed to an ostensibly independent decision-maker in circumstances analogous to those in plaintiff's case. In La Manna , the plaintiff, who was an applicant for an officer position in the defendant's police department, sued for discrimination after the city manager, Waffle, required the plaintiff to withdraw his application. 276 Or.App. at 151-53, 366 P.3d 773. The plaintiff, a gay man, was 50 years of age when he applied for the position and, among other claims, alleged age discrimination under state and federal statutes and sexual orientation discrimination under ORS 659A.030. Id. at 151, 366 P.3d 773. The plaintiff based his age discrimination claims in part on comments made by Russell, one of the officers involved in the application process. Id . at 152, 366 P.3d 773. He based his sexual orientation claim on the fact that Waffle claimed to have required the plaintiff to withdraw his application because the plaintiff was a friend of the police chief, and he wanted to avoid the appearance of favoritism. Id. at 153-54, 366 P.3d 773. The plaintiff viewed that explanation as a pretext, because the defendant had previously hired two other friends of the police chief. Id . at 154, 366 P.3d 773. The trial court granted summary judgment on all of the plaintiff's claims, concluding that he had not raised a genuine issue of material fact as to any discriminatory act. Id . at 156, 366 P.3d 773.
In relevant part, the defendant's arguments on appeal included the contention that Russell's comments were not relevant on the age discrimination claims because Waffle had been the sole decision-maker. Id . at 159, 366 P.3d 773. Citing the Ninth Circuit's decision in Poland v. Chertoff , 494 F.3d 1174 (9th Cir. 2007), however, we rejected that argument in connection with the plaintiff's federal age discrimination claim. Id . at 160, 366 P.3d 773. We noted that Russell had spoken about the plaintiff to another officer, Wellhouser, and that the city recorder, Roth, had complained about the plaintiff's application based on information that was ultimately traceable *30 to Russell. Id . at 160, 366 P.3d 773. Given that Waffle testified that he had required the plaintiff to withdraw based on information that he had received from Wellhouser and Roth, we concluded:
"Accordingly, Russell's opinion about plaintiff was part of Waffle's decisionmaking process. See Poland v. Chertoff, 494 F.3d 1174, 1182 (9th Cir. 2007) (even in a case involving an 'independent decisionmaker,' conduct of a biased subordinate can prove pretext if 'the biased subordinate influenced or was involved in the decision or decisionmaking process'). Thus, even though they are not direct evidence of discriminatory motive on Waffle's part, Russell's comments contribute to an inference *64 that the decision to require plaintiff to withdraw was based on his age."
Id . at 160. Thus, we recognized Poland 's articulation of the imputation of subordinate bias theory to correctly state federal law on this point.[4] More important to this case, however, we applied the same rule to the plaintiff's state law age discrimination claim. See id. at 164, 366 P.3d 773. Although we did *31 not cite Poland in connection with that claim, we incorporated our conclusions-including our conclusion regarding the significance of Russell's comments-from our federal law analysis, indicating that the cat's paw theory applied to the plaintiff's state law claim just as it did to his federal claim. Id .
Even more significantly, we made that implicit adoption of the cat's paw theory explicit when addressing the plaintiff's state law sexual orientation discrimination claim. Id . at 165, 366 P.3d 773. As to that claim, the defendant argued that Waffle was not even aware that the plaintiff was gay, and so Waffle could not have required him to withdraw his application "because of" his sexual orientation. Id . at 164-65, 366 P.3d 773 (citing ORS 659A.030(1)(a) ). Again citing Poland , we disagreed:
"Wellhouser knew of plaintiff's sexual orientation, and he discussed plaintiff, plaintiff's application for the police officer position, and plaintiff's run for sheriff with Waffle, in support of his view that plaintiff should not be hired. Even if a trier of fact cannot infer from that evidence that Wellhouser actually told Waffle that plaintiff was gay, Wellhouser's complaint to Waffle can support an inference that Wellhouser was a 'biased subordinate' who 'influenced or was involved in the decision or decisionmaking process.' Poland , 494 F.3d at 1182. We agree with the Ninth Circuit that, to show that defendant-the City of Cornelius-discriminated against him, plaintiff must show that his protected characteristic caused the discrimination; plaintiff is not required to show that the person who made the decision had the protected characteristic in mind if that person or the decisionmaking process was influenced by a subordinate who was biased against the plaintiff because of the protected characteristic."
Id . at 165-66, 366 P.3d 773 ; see also LaCasse , 278 Or.App. at 37, 373 P.3d 1178 (applying La Manna and Poland ). That conclusion in La Manna , that the plaintiff was "not required to show that the person who made the decision had the protected characteristic in mind if that person or the decisionmaking process was influenced by a subordinate who was biased against the plaintiff because of the protected characteristic," is consistent *32 with both the interpretation that plaintiff urges for ORS 654.062(5) and ORS 659A.199 and his requested special jury instruction.
Although, as noted, La Manna construed ORS 659A.030(1)(a) rather than either of the *65 two statutes at issue in this case, our interpretation of very similar language in that related statute is valuable context for the task at hand. See Klein , 352 Or. at 309, 283 P.3d 350 (interpretive context for statutes includes related statutes and cases construing them). Much like plaintiff's claim under ORS 654.062(5), which required him to establish that defendant discriminated against him "because" he had engaged in protected conduct, liability under ORS 659A.030(1)(a) requires proof that an employer has discriminated against a current or prospective employee "because of" a protected status or characteristic of the employee. And, as we have explained, we see no practical distinction between the term "because" in ORS 654.062(5) and the phrase "for the reason that" in ORS 659A.199. Both, therefore, are analytically the same as "because of" as that phrase appears in ORS 659A.030(1)(a). Because we have construed ORS 659A.030(1)(a) to require a plaintiff only to show that the plaintiff's protected characteristic caused discrimination, and not that the "person who made the decision had the protected characteristic in mind," La Manna , 276 Or.App. at 165-66, 366 P.3d 773, we see no justification for ascribing a different intention to the legislature in construing ORS 654.062(5) or ORS 659A.199. Accordingly, we conclude that plaintiff's proposed jury instruction correctly stated the applicable law.[5] *33 In a memorandum of additional authorities, defendant acknowledges our acceptance of the subordinate bias theory in La Manna and LaCasse , but suggests that those decisions apply only prospectively. But, as plaintiff correctly observes, on appeal, we apply the law in effect at the time of appeal. See State v. Jury , 185 Or.App. 132, 136-37, 57 P.3d 970 (2002), rev. den. , 335 Or. 504, 72 P.3d 636 (2003) (stating that, in most instances, it is appropriate to determine whether error occurred in reference to the law in effect at the time the appeal is decided). Because the cat's paw or subordinate bias theory is the law in Oregon, plaintiff's proposed instruction was a correct statement of law.
Having concluded that plaintiff's proposed instruction was a correct statement of law, we turn to whether the operative pleadings at the time of trial supported that instruction. A party is entitled to an instruction on his theory of his case if the proposed instruction "engages" the pleadings. Estate of Michelle Schwarz v. Philip Morris Inc. , 348 Or. 442, 452, 235 P.3d 668, adh'd to on recons , 349 Or. 521, 246 P.3d 479 (2010). Defendant argues that plaintiff's requested instruction was not supported by the pleadings, because plaintiff neither alleged facts in support of a cat's paw theory in his third amended complaint, nor moved at trial to conform his pleadings to encompass that theory. In response, plaintiff points out that defendant's own pleading raised the affirmative defense that any adverse employment actions taken against plaintiff were for legitimate, lawful reasons. That, plaintiff observes, made the causal link between plaintiff's safety complaints and his ultimate termination a central issue in the case. Plaintiff contends that, because defendant argued that St. Jacques lacked any retaliatory motive to terminate his employment, the question of whose motivations were relevant-a question answered by plaintiff's proposed jury instruction-arose directly from that defense. We agree with plaintiff that the pleadings support his proposed special jury instruction. First, plaintiff's third amended complaint alleged that defendant had retaliated against him *66 "because" of his safety complaints, and, as we have explained, the cat's paw instruction is directed at that causal element. 290 Or.App. at 27, 415 P.3d at 62. Second, as plaintiff points out, defendant's answer raises that same issue by *34 contending that defendant took the actions it did for legitimate reasons.[6] Accordingly, we reject defendant's contention that the pleadings did not support plaintiff's requested jury instruction.
We next consider whether the evidence presented at trial supported plaintiff's proposed jury instruction. In defendant's view, it did not. But we note that plaintiff's hurdle is not high: A party is entitled to an otherwise sound jury instruction "if there was any competent evidence to support it." Crismon v. Parks , 238 Or.App. 312, 314, 241 P.3d 1200 (2010) (citations omitted). Thus, to warrant the issuance of a cat's paw instruction, plaintiff had only to produce competent evidence (1) that a subordinate of St. Jacques was motivated to retaliate against plaintiff because of his statutorily protected complaints and (2) that the same biased subordinate influenced or was involved in the ultimate decision to terminate his employment. Or, stated somewhat differently, the evidence at trial must have been capable of supporting the inference that St. Jacques's ostensibly independent employment decision was not wholly insulated from her subordinates' wrongful motives. See Poland , 494 F.3d at 1182-84 (because investigation leading to unwanted transfer was not entirely independent, it did not break the causal chain between plaintiff's protected activity and that adverse employment action).
We conclude that the evidence was sufficient to establish that relationship. First, plaintiff's evidence supported the inference that both Treppens and Delgado were motivated to retaliate against him because of his safety complaints. For example, Cloud, the JATC administrator, testified that Delgado had expressed concern that he would personally bear the consequences if the EAP were to be found out of compliance with state and federal safety requirements.
*35 Plaintiff, in turn, testified that Delgado had shown him a notice of a hearing where JATC would be assessing EAP-related safety concerns and allegations that on-the-job training hours were being falsely reported; according to plaintiff, Delgado had told him that, if he disclosed those concerns to JATC, plaintiff would be barred from the Nike campus. In addition to that testimony, plaintiff introduced Treppens's email in which he had documented plaintiff's and Hodson's intentions to file a safety complaint with Oregon OSHA, and one of the apprentices in defendant's program testified that Treppens had told him, "[Plaintiff] is so big on safety, sooner or later he's going to make a mistake, and when he does, we'll get him."
Second, there was evidence from which reasonable jurors could find that Miller's investigation into the grounds for plaintiff's termination was not free from Treppens and Delgado's influence. Indeed, Miller's investigation relied primarily on information that she had obtained from those two individuals, including several emails from each of them documenting alleged performance and behavioral problems; Miller later forwarded those emails directly to St. Jacques, the decision-maker. Miller also accepted Treppens's assessment that plaintiff had not been forthcoming or honest about his use of the gym during PowerDown, a matter that St. Jacques expressly acknowledged had heavily influenced her decision to terminate plaintiff. Moreover, Miller went so far as to obtain input from Treppens when drafting plaintiff's termination letter on behalf of St. Jacques.
Finally, there was evidence to support the inference that Treppens and Delgado directly influenced St. Jacques's decision to fire plaintiff. In addition to evidence that St. Jacques *67 relied on Miller's investigation-itself based on little more than Treppens and Delgado's input-as well as materials from those two that Miller forwarded to St. Jacques, plaintiff produced emails suggesting that St. Jacques sought Treppens's input in the investigation. Collectively, plaintiff submitted ample evidence to support his theory that Treppens and Delgado were directly involved in Miller's investigation and that, as a result of both that connection and St. Jacques's direct contact with Treppens, the decision to fire plaintiff was influenced by Treppens *36 and Delgado and, ultimately, was made because of their allegedly wrongful motives. That evidence, therefore, supported plaintiff's proposed jury instruction.
As defendant notes, however, even though plaintiff's proposed jury instruction may be a correct statement of law and supported by the pleadings and evidence, the trial court did not err if the substance of the requested jury instruction was fully covered by the other jury instructions that the court gave. Hernandez , 327 Or. at 106, 957 P.2d 147. Defendant argues that the court did not err in failing to give plaintiff's requested instruction, because the substance of plaintiff's cat's paw theory was addressed by the substantial factor causation and corporate agency jury instructions. We do not agree, however, that the instructions that were given sufficiently informed the jury that it could find for plaintiff on a cat's paw theory.
The trial court did not give a separate instruction regarding substantial factor causation, but instead incorporated that concept into the substantive instructions it gave regarding the elements of each of plaintiff's retaliation claims, presumably intending it to convey the requirement of a causal link between plaintiff's safety complaints and defendant's adverse employment decision. Specifically, the court told the jury:
"To recover on this claim, [plaintiff] must prove by a preponderance of the evidence [that]:
"* * * * *
"(2) Nike discharged, demoted, suspended, refused to promote, discriminated, or retaliated against [plaintiff] regarding any term, condition, or privilege of employment; and [plaintiff] reporting the information was a substantial factor in Nike's decision. A substantial factor is a factor that made a difference."
In addition, the trial court provided the following instruction on corporate agency:
"A corporation can act only through its officers or employees. Any action by an officer or employee of the corporation is the act of that corporation if the act was within the scope of that person's authority and/or employment. "
(Emphasis added.)
*37 Without a cat's paw instruction, the jury would not understand that it could find a causal link between Treppens's and Delgado's wrongful motives and St. Jacques's employment decision based solely upon the influence that those individuals had on the decision, whether or not St. Jacques shared their motive in her decision to terminate plaintiff. That is, a cat's paw instruction would permit the jury to impute those motives to defendant, so long as plaintiff could show that either Treppens or Delgado, who allegedly held retaliatory motives, had "influenced or [had been] involved in the decision or decisionmaking process." Poland , 494 F.3d at 1182. By merely stating that plaintiff's safety complaints must be a substantial factor in Nike's decision, the instruction that the court gave failed to adequately convey that message. See Hernandez , 327 Or. at 106, 957 P.2d 147 (noting that a party is entitled to a jury instruction when it is needed to fully explain a material issue not fully addressed by the court's other instructions).
The corporate agency instruction, in turn, failed to fill that gap; in fact, it arguably precluded the argument that the cat's paw theory would allow. By limiting defendant's liability to acts "within the scope of [the actor's] authority and/or employment," that instruction suggested that the only relevant actions-and, therefore, the only relevant motives-were St. Jacques's actions and motives, because the decision to terminate plaintiff was only within her scope of authority and not the authority of the biased subordinates. As defendant's evidence showed, neither Treppens nor Delgado had the authority to terminate plaintiff's employment. Thus, *68 rather than provide support for plaintiff's subordinate bias argument, the corporate agency jury instruction, without the benefit of plaintiff's cat's paw instruction, would have constrained the jury's consideration of those individuals' motives and their influence on St. Jacques's decision.
Because the court declined to give plaintiff's instruction, defendant was able to capitalize on the instructions given, using them to sever the causal link between plaintiff's safety complaints and his termination. Defendant argued in closing:
*38 "The only permissible question is whether or not the termination decision was improperly motivated by a desire to retaliate against [plaintiff], and there is no evidence that Nellie St. Jacques ever had that motivation."
And, because the instructions that the court gave did not inform the jury of the law supporting plaintiff's cat's paw theory-a failing that defendant availed itself of-and, indeed, were largely counter to it, those instructions did not fully cover the substance of plaintiff's requested instruction.
Finally, the trial court's error in refusing to provide plaintiff's requested jury instruction is reversible error only if the instructions as a whole caused plaintiff prejudice. Hernandez , 327 Or. at 106, 957 P.2d 147. The party requesting an instruction is prejudiced if the trial court's failure to give the requested instruction probably created an erroneous impression of the law in the minds of the members of the jury and that erroneous impression may have affected the outcome of the case. Id. at 106-07, 957 P.2d 147. Here, the court's failure to provide the jury a cat's paw instruction likely created the erroneous impression that only St. Jacques's motives, and not those of her subordinates, were relevant to the issue of causation. Because that erroneous impression may have affected the jury's verdict in favor of defendant, reversal is warranted.
Judgment on claims for safety complaint retaliation and whistleblower retaliation reversed and remanded; otherwise affirmed.

The term "cat's paw" derives from a fable conceived by Aesop, in which a monkey convinces a cat to remove roasting chestnuts from a fire. After the cat burns its paws doing the monkey's bidding, the monkey steals the chestnuts. Staub v. Proctor Hosp., 562 U.S. 411, 415 n. 1, 131 S.Ct. 1186, 179 L.Ed.2d 144 (2011). In practice, the cat's paw theory-also known as the "imputation of subordinate bias theory"-allows for the unlawful motive of a subordinate to be imputed to an ostensibly independent decision-maker who has made an adverse employment decision. Id . at 415, 131 S.Ct. 1186.

Oregon OSHA is a division of the Department of Consumer and Business Services that is authorized by statute to enforce statewide workplace safety rules. See ORS 654.003.

In relevant part, ORS 654.062(6) gives employees a private right of action against employers who are alleged to have violated ORS 654.062(5).

Likewise, in the instant case, plaintiff's requested jury instruction correctly reflected the cat's paw or subordinate bias theory recognized under federal law. See Shager v. Upjohn Co. , 913 F.2d 398, 405 (7th Cir. 1990) (on age discrimination claim, discriminatory motive of a district manager could, under proper circumstances, be imputed to the committee that ultimately fired the plaintiff). Given that the cat's paw theory developed, in part, to address the circumstances that plaintiff alleged were present in his case, plaintiff argued that it was appropriate to instruct the jury on that theory here. See Russell v. McKinney Hosp. Venture , 235 F.3d 219, 227 (5th Cir. 2000) (noting that a subordinate bias claim arises when an employer purports to decide whether an adverse employment action is warranted, but merely acts as a rubber stamp for a subordinate's improper motives).
We note that, following Shagar , other circuits have used the term "cat's paw" when discussing subordinate bias claims, but they have articulated the underlying theory in various ways. See EEOC v. BCI Coca-Cola Bottling Co. of Los Angeles , 450 F.3d 476, 487 (10th Cir. 2006), cert. dismissed , 549 U.S. 1334, 127 S.Ct. 1931, 167 L.Ed.2d 583 (2007) (describing different approaches across circuits). Notably, however, the Ninth Circuit permits recovery under its version of the cat's paw theory when the "biased subordinate influenced or was involved in the decision or the decisionmaking process." Poland , 494 F.3d at 1182 (emphases added). Consistent with the Ninth Circuit's approach, which we adopted in La Manna , plaintiff's proposed jury instruction would have required the jury to decide whether St. Jacques's decision had been truly independent or, instead, one or more of her subordinates had possessed "a biased retaliatory motive against" plaintiff and "influenced or was involved in the adverse employment decision." Thus, plaintiff's instruction was, at a minimum, a correct statement of federal law as articulated in cases like Poland.

The parties have not provided any legislative history to assist us in determining the legislature's intentions, nor have we found any that is helpful. However, to the extent that there remains doubt as to the proper construction of either statute, we note that both statutes are remedial in nature, and that, by discouraging employers from hiding their discriminatory decisions behind ostensibly "neutral" decision-makers, our construction furthers that remedial purpose. See PSU Association of University Professors v. PSU , 352 Or. 697, 710-12, 291 P.3d 658 (2012) (noting "protective purposes of ORS Chapter 659A" and discussing federal case law construing related provisions in Title VII in light of their curative purpose, which is to protect against retaliation against employees who rely on the remedial mechanisms provided by that title); Halperin v. Pitts , 352 Or. 482, 495, 287 P.3d 1069 (2012) (when construing statutes, we construe remedial statutes to effectuate legislative intent, if that construction is consistent with the text of the statute).

Also, as we explain in the discussion that follows, plaintiff presented evidence at trial to support a cat's paw theory. Thus, we note that, even if the operative complaint lacked explicit allegations supporting a cat's paw instruction, the admission of such evidence without objection would act to amend the complaint by operation of law. See Whinston v. Kaiser Foundation Hospital , 309 Or. 350, 355, 788 P.2d 428 (1990), overruled on other grounds by Shoup v. Wal-Mart Stores, Inc. , 335 Or. 164, 61 P.3d 928 (2003) ("[A] pleading for all practical and legal purposes is automatically amended whenever an issue not raised by the pleading is tried by consent." (Footnotes omitted.) ).